[Crim. No. 7468. In Bank. Jan. 29, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT B. DORADO, Defendant and Appellant.

Edward L. Cragen, under appointment by the Supreme Court, for Defendant and Appellant.

Robert H. Lund, E. Fred Lightner, William T. Pillsbury, David H. Battin, Jim F. Kingham, Frederick D. Smith, Doris Brin Walker, Malcolm Burnstein, Aubrey Grossman, James Herndon, Harry Margolis, Donald L. A. Kerson, George T. Davis, Earl Klein, Erling J. Hovden, Public Defender (Los Angeles), John M. Moore and James L. McCormick, Deputy Public Defenders, as Amici Curiae on behalf of Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Arlo E. Smith, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Albert W. Harris, Jr., Robert R. Granucci, Michael R. Marron, Charles W. Rumph

and Paul N. Wenger, Deputy Attorneys General, and Bruce B. Bales, District Attorney (Marin), for Plaintiff and Respondent.

Joseph A. Ball as Amicus Curiae on behalf of Plaintiff and Respondent.

Edward L. Barrett, Jr., as Amicus Curiae, upon the request of Chief Justice Traynor.

TOBRINER, J.—Defendant appeals from a judgment on a verdict finding him guilty of violation of Penal Code section 4500, which provides for the automatic penalty of death. The indictment charged defendant, a 26-year-old prisoner serving a life term for sale of marijuana, with malicious assault with a deadly weapon which resulted in a fellow prisoner's death. The court denied defendant's motion for a new trial. Penal Code section 1239, subdivision (b), provides for an automatic appeal.

The main issue of this case involves the admission into evidence of defendant's confessions. For the reasons which we set out hereinafter we have concluded that in the light of recent decisions of the United States Supreme Court the confessions, as obtained in this case, should have been excluded; their admission requires reversal. For guidance of the court upon retrial we set forth why we have rejected defendant's contentions that the evidence failed to show that he was validly imprisoned under a life sentence and that the court failed properly to instruct the jury. We do not discuss defendant's remaining arguments because the factual situations upon which they rest will in all likelihood not recur.

### The Confessions

The facts of this case show the background and occasion for defendant's confessions. According to prison officers, they discovered, at about 8 a.m. on December 12, 1961, the body of one Nevarez in the lower yard behind the bleachers and near the industrial quonset huts at San Quentin Prison. About 20 minutes later medical personnel pronounced the victim dead upon arrival at the prison hospital. The nature of the chest wounds of the victim showed that they could have been inflicted by a small knife and that the victim probably had been physically restrained during the killing.

Correctional officers undertook an immediate investigation

and discovered, in a trashcan in a nearby restroom, a blood-stained blue denim jacket with the prison identification number cut out, the name ''Dorado''[1] on the pocket, and a button missing. In the same trashcan they found a melton jacket with the number removed and a sharpened knife with a taped handle. They found the button belonging to the blue denim jacket at the scene of the homicide. The officers discovered in another trashcan a second sharpened knife with a taped handle stained with blood.

When the officers located defendant in his cell around 9 a.m. he was attired in his underwear. Upon their request that he dress, he donned clean clothing. The officers found no worn clothing in his cell but did discover a roll of tape similar to that used to tape the knife handles. Under a stack of soiled clothing in a clothes hamper the officers found defendant's bloodstained trousers.

Captain Hocker, an official of San Quentin Prison, testified that the officers brought defendant to his office between 9 a.m. and 10 a.m. In order to examine defendant for superficial cuts and scratches, Captain Hocker requested that defendant strip to the waist. Immediately thereafter defendant dressed again. When defendant was shown the jacket on which his name appeared he made no comment, but upon being told that Nevarez was dead defendant wept. Captain Hocker then requested Officer Glazier to take defendant to the hospital laboratory in order that a technician might remove and test some brown flecks on defendant's hands which appeared to be dried blood. After defendant's return about an hour later, Mr. Midyett from the district attorney's office arrived.

Mr. Midyett and Captain Hocker testified that early in the afternoon, in the course of an interrogation lasting about two hours, defendant admitted the killing. Both testified, further, that on the next morning, December 13, at his cell in the adjustment center, defendant, in the presence of Mr. Midyett, gave a written statement. Thereafter, defendant escorted Mr. Midyett and a prison officer over the route he had taken in the course of the killing, discussing with them certain details of the crime. On December 15, and after codefendant Jiminez had been apprehended on suspicion of complicity, a third interrogation took place. On this occasion defendant implicated Jiminez as the accomplice who held Nevarez.

At the trial Captain Hocker testified that he not only

---

[1]Defendant was the only prisoner in San Quentin named ''Dorado.''

initially interrogated the defendant but had been present during the major part of defendant's interrogation by members of the district attorney's office. On cross-examination, Captain Hocker was asked, "Did you see or hear anybody mention to Mr. Dorado his right to counsel?" and "Or his right not to incriminate himself or testify against himself?" To both questions, he answered in the negative. Mr. Midyett testified to the same effect.

Defendant's testimony on *voir dire* conflicted sharply with the testimony of the officers. Defendant claimed that he had not freely and voluntarily confessed, but had fabricated the confession partly because he feared threats made by Captain Hocker at an initial interrogation on the morning of December 12. This was the only occasion upon which he and Captain Hocker engaged in conversation alone and without benefit of a tape recorder. Defendant further claimed that upon hearing of the death of Nevarez, who was his friend, he became grief-stricken and susceptible to influence, and that moreover he was under the narcotic effects of glue.

Defendant also testified that Captain Hocker forced him to strip and stand completely naked in his office for some 20 minutes or more. He stated that Captain Hocker swore at him and threatened to brand him an informer and turn him loose in the prison yard to be subjected to the retribution of the other prisoners if he did not cooperate. Finally, defendant claimed that Captain Hocker indicated that he would see that defendant did not get the death penalty if he confessed, thus implying that defendant would not be prosecuted under Penal Code section 4500. Defendant further testified that the influence of these coercive pressures continued in his mind so that he subsequently fabricated the confessions to avoid placing his life in jeopardy at the hands of other prisoners because they might be told that he informed on the real culprit. Captain Hocker denied these facts in every detail and stated that he treated defendant respectfully in view of his obvious remorse.

Defendant argues that Captain Hocker's language and inducements in extracting a confession from Jiminez indicate the truth of his own assertion of coercion. The trial court did in fact rule that the Jiminez confession was the result of coercion. The treatment accorded Dorado, however, differed from that given Jiminez. This difference, Captain Hocker explained, occurred because Dorado's attitude was quiet and subdued, so that no one could be angry with him, and because he confessed readily under interrogation, whereas Jiminez

proved obdurate.[2] Furthermore, Captain Hocker noted that the coerced Jiminez confession came several days after defendant's and was preceded by sustained and frequently abusive questioning coupled with solitary confinement.

Although we accept the finding of the trial court that the confessions of defendant were not obtained by coercion, we have concluded that they should not have been admitted into evidence under recent rulings of the United States Supreme Court. In a long series of cases that court has been troubled by confessions obtained without protection of counsel;[3] this historic concern of the court culminated in two recent decisions: *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], and *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. Since we must faithfully discharge our duty to apply to the instant case the Constitution of the United States as interpreted by the Supreme Court of the United States, we must follow these recent decisions.

*Massiah* holds that the prosecution cannot introduce into evidence defendant's ''own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.'' (377 U.S. at p. 206.) Defendant, who had been indicted for violation of the federal narcotics laws, had retained counsel. After defendant's release on bail, a federal agent arranged with one Colson, who had been jointly indicted with defendant, for the installation in Colson's car of a radio transmitter. This device enabled the agent, through a receiving set in a car parked down the street, to listen to Colson's conversation with defendant. The statements of defendant thus elicited were presented to the

---

[2]Captain Hocker gave the following testimony: ''By contrast, Jiminez was arrogant and disrespectful. Another reason for taking a different approach was because this is a modus operandi I used many times in interrogations where people are participating, and in the vernacular it is the good guy-bad guy approach. [*] I was a bad guy. I growled at him and left the room and my partner assumed the testimony—the interrogation.''

[3]See, for example, *Haynes* v. *Washington* (1963) 373 U.S. 503 [83 S.Ct. 1336, 10 L.Ed.2d 513]; *Gallegos* v. *Colorado* (1962) 370 U.S. 49 [82 S.Ct. 1209, 8 L.Ed.2d 325, 87 A.L.R.2d 614]; *Culombe* v. *Connecticut* (1961) 367 U.S. 568 [81 S.Ct. 1860, 6 L.Ed.2d 1037]; *Crooker* v. *California* (1958) 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448]. For a more complete list of citations, see *Spano* v. *New York* (1959) 360 U.S. 315, 321, n. 2 [79 S.Ct. 1202, 3 L.Ed.2d 1265].

---

*Also termed the ''Friendly-Unfriendly'' act. For a description of this technique, see Inbau and Reid, Criminal Interrogation and Confessions (1962) pp. 58-60.

jury through the agent's testimony. Reversing the conviction, the Supreme Court held that the defendant had been denied the assistance of counsel "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." (*Id.* at p. 206.) Referring to *Spano* v. *New York* (1959) 360 U.S. 315, [79 S.Ct. 1202, 3 L.Ed.2d 1265], the court commented: "It was said that a Constitution which guarantees a defendant the aid of counsel at . . . a trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding. Anything less, it was said, might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.' 360 U.S. at 326. (Douglas, J. concurring.)" (*Massiah* v. *United States, supra,* 377 U.S. 201, 204.)

*Escobedo* recognizes that this critical stage may be reached before indictment. In that case a 22-year-old defendant was arrested and interrogated about the fatal shooting of his brother-in-law. After retaining a lawyer, he obtained his release on habeas corpus because of the insufficiency of the evidence against him. Ten days later, upon being told by one DiGerlando that Escobedo had fired the fatal shots, the police again arrested Escobedo and brought him to police headquarters between 8 and 9 p.m. During the ensuing interrogation, Escobedo repeatedly requested to see his lawyer, who arrived at the station about 10:30 p.m. that evening, but the police ignored his request and continued their questioning. By 10:15 p.m. they had elicited from Escobedo an admission which indicated that he knew something of the crime. By 11:30 p.m. he had given the police and the prosecution attorneys a full confession.

The United States Supreme Court held that "where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright,* 372 U.S., at

342 [84 S.Ct. 1758, 12 L.Ed.2d 977], and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 490-491.) In its conclusion the court stated: "We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." (*Id.* at p. 492.)

The facts of the instant case bring it squarely within the rule of *Escobedo* with the exception that Dorado did not retain or request counsel. Thus the two cases parallel each other in the following respects: (1) The investigation in the instant case had ceased to be a general inquiry into an "unsolved crime" and had begun to focus on defendant. The weight of the circumstantial evidence recited above and available to the officers at the point of interrogation provided reasonable grounds for focusing upon defendant as the particular suspect. If anything, the evidence against defendant at the time of interrogation was more conclusive than that marshalled against Escobedo. (2) The defendant was in custody. (3) The officers did not merely engage in general questioning but subjected defendant to a process of interrogations that lent itself to obtaining incriminating statements. Their purpose in so doing was "to elicit a confession" (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 492), "to 'get him' to confess his guilt despite his constitutional right not to do so." (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 485.) (4) The record shows that the authorities did not in any manner warn defendant of his "absolute constitutional right to remain silent." (*Id.* at p. 491.) Captain Hocker and Mr. Midyett both testified that no such warning was ever given to defendant.

The question presented here, then, centers upon whether the failure of the accused to retain or request counsel justifies the application of a rule of law different from that established in *Escobedo*. The basic reasoning of the court's opinion in *Escobedo* will not permit such a formalistic distinction.

As we shall explain in more detail hereinafter, *Escobedo* holds that defendant's right to counsel matured at the accusatory stage: "the 'stage when legal aid and advice' were most critical" to defendant; therefore, his vocalization of that right cannot be the determinative factor. The United States Supreme Court and many other courts have recognized that in the situation in which a defendant is entitled to counsel the request itself can be no more than a formality; indeed, any

such requirement would discriminate in favor of the sophisticate in the ways of the criminal court. If, however, the officers inform the accused of his right to counsel, he may waive it, and in such event his confession may be introduced into evidence. *Escobedo* also holds that the accused has the right to remain silent and that he must likewise waive that right if his self-incriminatory statements are to be admitted against him.

*Escobedo* holds that a defendant must be afforded his right to counsel as soon as ". . . the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession. . . ." (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 492.) The power of the state to extract from the individual the incriminating statements which may be crucial to his defense can take effect before the formality of indictment. After custody the interrogation may become the critical stage in the establishment of the prosecution's case. "There is necessarily a direct relationship between the importance of a stage to the police in their quest for a confession and *the criticalness of that stage to the accused in his need for legal advice."* (Italics added.) (*Id.* at p. 488.) In holding that defendant should have "the guiding hand of counsel" (*Powell* v. *Alabama* (1932) 287 U.S. 45, 69 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527]) at the accusatory stage, *Escobedo* states, "This was the 'stage when legal aid and advice' were most critical to petitioner. *Massiah* v. *United States, supra* at 204. It was a stage surely as critical as was the arraignment in *Hamilton* v. *Alabama,* 368 U.S. 52 [82 S.Ct. 157, 7 L.Ed.2d 114], and the preliminary hearing in *White* v. *Maryland,* 373 U.S. 59 [83 S.Ct. 1050, 10 L.Ed.2d 193]. What happened at this interrogation could certainly 'affect the whole trial,' *Hamilton* v. *Alabama, supra,* at p. 54, since rights 'may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes.' *Ibid."* (*Id.* at p. 486.)

In a decision that preceded *Massiah* and *Escobedo* this court recognized that the accused has a right to counsel at this critical accusatory stage. In the prophetic words of Justice Schauer, writing for the court in *People* v. *Lopez* (1963) 60 Cal.2d 223, 243 [32 Cal.Rptr. 424, 384 P.2d 166] : "Neither Article I, section 13, nor the statutes implementing the right granted therein, should be construed in a manner that would hamper legitimate police investigation when no substantial right of the accused is involved. We do not believe

that the accused has a right to have counsel present during *purely investigatory activities* which are *not* designed to elicit information *from the accused* or *otherwise* impinge upon his constitutional rights.'' (Italics added.)[4]

The right to counsel matures at this critical accusatory stage; the right does not originate in the accused's assertion of it. The accused's request for counsel indicates no more than that he, himself, at that point in the proceedings, perceived the need of legal assistance. The request merely constitutes evidence that the accused finds himself in an accusatory predicament. *Escobedo* did not treat the request for counsel as the reason for the establishment of the right; it points out that the right had previously crystallized in the accusatory stage. ''When petitioner requested, and was denied, an opportunity to consult with his lawyer, the investigation *had* ceased to be a general investigation of 'an unsolved crime.' [Citation omitted.] Petitioner *had* become the accused, and the purpose of the interrogation *was* to 'get him' to confess his guilt despite his constitutional right not to do so.'' (Italics added.) (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 485.) Thus the sequence of events had occurred to fix the stage as the critical one; the investigation had become accusatory; the purpose was to get him to confess. The request for counsel could not *cause* these events; the prosecution did not conceive the purpose of getting Escobedo to confess *because* he requested counsel.[5]

The United States Supreme Court and other courts have recognized that in a situation in which a suspect has the constitutional right to counsel it cannot be lost because he did not request or retain counsel. Resting its ruling upon earlier United States Supreme Court cases, the United States Court of Appeals for the Ninth Circuit in the very recent case of

---

[4]See discussion of Justice Friedman, in *People* v. *Sigal* (1963) 221 Cal.App.2d 684, 703 [34 Cal.Rptr. 767].

[5]''Implicit in *Escobedo* is the proposition that in a pretrial police interrogation the accused has a right to remain silent, which he must waive intelligently before any self-incriminating statements will be admissible at trial. At the very least the Court held that where the accused has not been effectively warned of his right to remain silent, he is entitled to counsel to enforce that right if he has retained and requested counsel. But neither retention of, nor request for, counsel seems essential, for in other situations the right to counsel, once established, has not depended on these factors. [Footnote omitted.]'' (Note, *The Supreme Court, 1963 Term,* (1964) 78 Harv.L.Rev. 143, 219; see, also, Note, *Waiver of the Right to Counsel in State Court Cases: The Effect of Gideon* v. *Wainwright* (1964) 31 U.Chi.L.Rev. 591, 602.

*Wright* v. *Dickson* (1964) 336 F.2d 878, 882, explained its position on this exact point: ''Under the rule of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], appellant was denied his constitutional right to assistance of counsel at the June 10 hearing if the investigation was then no longer a general inquiry but had focused on appellant (which seems incontrovertible), interrogation was conducted leading to incriminatory statements, appellant had requested and been denied counsel and appellant had not been effectively warned of his absolute constitutional right to remain silent. As Justice White pointed out in dissent, it makes no difference whether appellant asked to consult retained counsel or to be provided with the assistance of appointed counsel, nor, indeed, *whether he requested counsel at all, except as the latter fact might bear upon waiver.*'' (Italics added; footnotes omitted.)

In *Escobedo* itself, Justice White's dissenting opinion, in which Justices Clark and Stewart concurred, pointed out: ''Although the opinion purports to be limited to the facts of this case, it would be naive to think that the new constitutional right announced will depend upon whether the accused has retained his own counsel, cf. *Gideon* v. *Wainwright*, 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733]; *Griffin* v. *Illinois*, 351 U.S. 12 [76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R.2d 1055]; *Douglas* v. *California*, 372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811]; or has asked to consult with counsel in the course of interrogation. Cf. *Carnley* v. *Cochran*, 369 U.S. 506 [82 S.Ct. 884, 8 L.Ed.2d 70]. At the very least the Court holds that once the accused becomes a suspect and, presumably, is arrested, any admission made to the police thereafter is inadmissible in evidence unless the accused has waived his right to counsel.'' (378 U.S. at p. 495.)

Both the court of appeals and the dissent in *Escobedo* cite and rely upon the language of the United States Supreme Court in *Carnley* v. *Cochran* (1962) 369 U.S. 506, 513 [82 S.Ct. 884, 8 L.Ed.2d 70]: ''. . . it is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request. In *McNeal* v. *Culver* [365 U.S. 109 (81 S.Ct. 413, 5 L.Ed.2d 445)], *supra*, the petitioner's allegation that he had requested counsel was countered by a denial in the return that 'petitioner's constitutional rights were violated by the court's alleged refusal to appoint counsel in his behalf,' and the State Supreme Court noted that the record was silent as to any

request. We held that when the Constitution grants protection against criminal proceedings without the assistance of counsel, counsel must be furnished 'whether or not the accused requested the appointment of counsel. *Uveges* v. *Pennsylvania,* 335 U.S. 437, 441 [69 S.Ct. 184, 93 L.Ed. 127].' '' (See also *Tomkins* v. *Missouri* (1945) 323 U.S. 485, 487 [65 S.Ct. 370, 89 L.Ed. 407]; *Rice* v. *Olson* (1945) 324 U.S. 786, 788 [65 S.Ct. 989, 89 L.Ed. 1367]; *Gibbs* v. *Burke* (1949) 337 U.S. 773, 780 [69 S.Ct. 1247, 93 L.Ed. 1686]; *Palmer* v. *Ashe* (1951) 342 U.S. 134 [72 S.Ct. 191, 96 L.Ed. 154]; *Pennsylvania* ex rel. *Herman* v. *Claudy* (1956) 350 U.S. 116 [76 S.Ct. 223, 100 L.Ed. 126].)

*Massiah* leaves unchallenged the statement in *Carnley* v. *Cochran, supra,* 369 U.S. 506, 514, that "requesting counsel" is a "formality upon which . . . his [defendant's] right may not be made to depend." Indeed, *Massiah* refers to New York cases which did not predicate the right to counsel upon a request. These cases sustained that right at post-indictment or post-arraignment interrogations without regard to whether the accused had asked for counsel. (*People* v. *Di Biasi* (1960) 7 N.Y.2d 544 [200 N.Y.S.2d 21, 166 N.E.2d 825]; *People* v. *Waterman* (1961) 9 N.Y.2d 561 [216 N.Y.S.2d 70, 175 N.E.2d 445]; *People* v. *Meyer* (1962) 11 N.Y.2d 162 [227 N.Y.S.2d 427, 182 N.E.2d 103]; *People* v. *Rodriquez* (1962) 11 N.Y.2d 279 [229 N.Y.S.2d 353, 183 N.E.2d 651].) Further, in *People* v. *Donovan* (1963) 13 N.Y.2d 148 [243 N.Y.S.2d 841, 193 N.E.2d 628], the New York Court of Appeals held that an accused had been denied his right to counsel if a lawyer hired by his family was not allowed to consult with him at the preindictment interrogation, even though he did not request such counsel.

Finally, we must recognize that the imposition of the requirement for the request would discriminate against the defendant who does not know his rights. The defendant who does not ask for counsel is the very defendant who most needs counsel. ■ We cannot penalize a defendant who, not understanding his constitutional rights, does not make the formal request and by such failure demonstrates his helplessness. To require the request would be to favor the defendant whose sophistication or status had fortuitously prompted him to make it.[6]

---

[6]As the court in *Escobedo* stated, "We have also learned the companion lesson of history that no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the

■ Although in the instant case defendant could have waived his right to the assistance of counsel, we can find no waiver here in the absence of evidence that he knew of his right. Thus *Escobedo* points out that an "accused may, of course, intelligently and knowingly waive . . . his right to counsel either at a pre-trial stage or at the trial." (378 U.S. at p. 490 n. 14.) That defendant should be informed of such right in order to sustain an alleged waiver finds expression in *Griffith* v. *Rhay* (1960) 282 F.2d 711: "Since Griffith had a right to the assistance of counsel on the afternoon of the interrogation, his failure to request such assistance has significance only if it amounted to a waiver of that right. But a waiver is an intentional relinquishment or abandonment of a known right or privilege. A waiver cannot be effected unless it is intelligently and competently given." (*Id.* at p. 717.)

■ In the absence of evidence that defendant already knew that he had a right to counsel during interrogation, the failure of the officers to inform him of that right precludes a finding that he knowingly waived it.

*Escobedo* also holds that the accused has the right not to incriminate himself and to remain silent,[7] and that, if any self-incriminatory statements are to be admissible, he must waive that right. Such waiver presupposes knowledge of the right to remain silent; in the absence of evidence of such knowledge, the waiver requires a warning to the accused of that right.

*Escobedo* repeatedly emphasizes· that defendant in that case had not been informed of his absolute right to remain

citizens' *abdication through unawareness of their constitutional rights.*" (Italics added.) (*Escobedo* v. *Illinois, supra*, 378 U.S. 478, 490.) The concurring opinion of Justice Traynor in *People* v. *Garner* (1961) 57 Cal.2d 135, 165 [18 Cal.Rptr. 40, 367 P.2d 680], also recognizes the disadvantage inflicted upon an accused who is ignorant of legal process: "Giving an accused who has the means and foresight to retain an attorney (frequently the 'professional criminal') a right to counsel's presence during interrogation, would widen the gulf between the rights of a person with and one without counsel." (See also Barth, The Price of Liberty (1961) The Viking Press, New York, p. 162.)

[7]In *Haynes* v. *Washington* (1963) 373 U.S. 503, 511 [83 S.Ct. 1336, 10 L.Ed.2d 513], the court referred to defendant's "right to remain silent." See also, *Culombe* v. *Connecticut* (1961) 367 U.S. 568, 631 [81 S.Ct. 1860, 6 L.Ed.2d 1037]. In *Griffith* v. *Rhay* (1960) 282 F.2d 711, 717, it was assumed that "Griffith . . . had the right to remain silent." To the same effect, *Crooker* v. *California* (1958) 357 U.S. 433, 438 [78 S.Ct. 1287, 2 L.Ed.2d 1448]. See *Payne* v. *Arkansas* (1958) 356 U.S. 560, 567 [78 S.Ct. 844, 2 L.Ed.2d 975]; *People* v. *Simmons* (1946) 28 Cal.2d 699, 720-721 [172 P.2d 18].

silent at the accusatory stage and that he therefore had not waived the right. Thus the court states: "Without informing him of his absolute right to remain silent in the face of this accusation, the police urged him to make a statement." (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 485.) The court points out that under *Johnson* v. *Zerbst* (1938) 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357], "The accused may of course intelligently and knowingly waive his privilege against self-incrimination and his right to counsel either at a pretrial stage or at the trial," but explains that "no knowing and intelligent waiver of any constitutional right can be said to have occurred under the circumstances of this case." (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 490 fn. 14.) The court distinguishes *Crooker* v. *California* (1958) 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448], upon the ground "that the petitioner there, but not here, was explicitly advised by the police of his constitutional right to remain silent and not to 'say anything' in response to the questions. . . ." (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 491-492.)

■ Obviously, defendant could not waive the right to remain silent unless he knew of that right. ■ As the court in *Killpatrick* v. *Superior Court* (1957) 153 Cal.App.2d 146, 150 [314 P.2d 164], said in discussing the privilege against self-incrimination, "The defendant . . . cannot be charged with a waiver of the privilege unless it appears that he was aware of its existence and its surrounding safeguards and voluntarily and intelligently elected to refrain from asserting it." (See also *Trilling* v. *United States* (1958) 260 F.2d 677, 694-696; *Wong Sun* v. *United States* (1963) 371 U.S. 471, 486, fn. 12 [83 S.Ct. 407, 9 L.Ed.2d 441]; *People* v. *O'Bryan* (1913) 165 Cal. 55, 62 [130 P. 1042].)

■ Defendant here had the constitutional protection of an absolute right to remain silent; the prosecution could not introduce into evidence defendant's confession unless that right of silence were waived; in the absence of knowledge such waiver requires warning, but the officials gave no warning here.

We conclude, then, that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively

354

informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.

■ Nothing that we have said, of course, should be interpreted to restrict law enforcement officers during the investigatory stage from securing information from one who is later accused of the crime or from obtaining answers to their questions. Indeed, any statements obtained without coercion, including, of course, the unsolicited, spontaneous confession, given in the absence of the requirements for the accusatory stage, may be admitted into evidence.[8] ■ As the concurring opinion of Justice Traynor in *People* v. *Garner* (1961) 57 Cal.2d 135, 164 [18 Cal.Rptr. 40, 367 P.2d 680], states: "So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation."

Only when the investigatory stage has become an accusatory one, that is, when it has begun to focus on a particular suspect, the suspect has been taken into police custody, and the police have carried out a process of interrogations that lends itself to eliciting incriminating statements, does the doctrine of *Escobedo* apply and the confession given without the required warning or other clear evidence of waiver become inadmissible evidence. Moreover, an important consideration in determining whether the accusatory stage had thus been reached must be a careful concern that there be no interference with the legitimate police investigation of an unsolved crime.

Although the Attorney General urges that law enforcement will be severely handicapped by adhering to the requirements of rulings based on *Escobedo,* this argument as to law enforcement was raised in *Escobedo* itself and rejected by the United States Supreme Court. Moreover, we cannot overlook the consequences of a too restricted and limited reading of the decisions of the United States Supreme Court. Law enforcement will be harmed, not helped, by advising police officers, for example, that it is only when the suspect demands counsel that *Escobedo* applies, notwithstanding that

[8] The confession given in the following hypothetical situation put by the Attorney General is obviously admissible: "What about the person who is not known as a suspect but wants to confess an unsolved crime? . . . Shall the police stop him when he rushes into a police station and cries in distress that he wants to confess to a crime and tell him to be quiet until an attorney is obtained to represent him?" (Petition for Rehearing, p. 27.)

in all other respects an investigation has reached the accusatory stage and the other conditions of *Escobedo* have been met. In such circumstances any confessions that might be obtained would, upon review by the United States Supreme Court, be subject to exclusion, and convictions based upon them, reversible. Meanwhile, before the overturning of such a decision, police officers would continue to follow the wrong practices. As a result, their work would come to naught. We have endeavored here to inform law enforcement officials at what stage of their investigations an accused must be informed of his constitutional rights in order that any confessions, admissions, or incriminating statements he may thereafter make to them will be legally admissible.

We cannot presume to evaluate the merits of the rulings of the United States Supreme Court; we merely apply and enforce its decisions as we must. We note in passing, however, that many of the forebodings of law enforcement officials as to the effect of the rulings based on *Escobedo* have not been demonstrated by experience. Thus, prior to the rendition of the decisions, at least one of the larger counties of California,[9] the Federal Bureau of Investigation,[10] and the military[11]

[9]According to the Honorable John Nejedly, District Attorney of Contra Costa County, police officers of that county have advised suspects of their right to counsel ''. . . at the moment that the police intended to arrest and felt that they had the facts sufficient to justify the arrest. . . .'' (Assembly Com. on Criminal Procedure, San Francisco, July 21, 1964, at pp. 15-16.)

[10]Prior to *Escobedo*, the Federal Bureau of Investigation informed an arrested person of his rights to counsel and to remain silent. Thus J. Edgar Hoover, the Director of the Federal Bureau of Investigation, some time ago stated that the Bureau's agents are instructed to give the constitutional warnings: ''Agents are taught that any suspect or arrested person, at the outset of an interview, must be advised that he is not required to make a statement and that any statement given can be used against him in court. Moreover, the individual must be informed that, if he desires, he may obtain the service of an attorney of his own choice. . . .'' Hoover, *Civil Liberties and Law Enforcement: The Role of the FBI* (1952) 37 Iowa L.Rev. 175, 182. See also Report of the President's Commission on the Assassination of President Kennedy (1964) 619, 621, 625; *Jackson* v. *United States* (1964) 337 F.2d 136, 138; *United States* v. *Ruehrup* (1964) 333 F.2d 641, 644.

[11]The Uniform Code of Military Justice provides that no suspect may be interrogated without first being warned of his right not to make a statement and that any statement made may be used against him. (10 U.S.C.A. § 831 (b).) The United States Court of Military Appeals has reversed convictions on the ground that criminal suspects were denied the right to consult counsel during an investigatory interrogation before charges had been filed and before their right to military counsel accrued. (*United States* v. *Gunnels* (1957) 23 C.M.R. 354; *United States* v. *Rose* (1957) 24 C.M.R. 251.)

have substantially accepted the standards of the Supreme Court cases but have apparently encountered no serious impediments to law enforcement.

Finally, we cannot dispose of the introduction of the illegally obtained confession upon the ground that it constituted merely harmless error. Although under some circumstances the introduction into evidence of statements obtained from a defendant during police interrogation in violation of his right to counsel and his right to remain silent may constitute harmless error, we are convinced that the error is necessarily prejudicial when the statements are confessions. Indeed, *Escobedo* itself follows *Hamilton* v. *Alabama* (1961) 368 U.S. 52 [82 S.Ct. 157, 7 L.Ed.2d 114], and *White* v. *Maryland* (1963) 373 U.S. 59 [83 S.Ct. 1050, 10 L.Ed.2d 193], cases which do "not rest . . . on a showing of prejudice." (*White* v. *Maryland, supra,* at p. 60.)

The use of an involuntary confession results in a denial of due process and requires reversal "regardless of other evidence of guilt." (*People* v. *Matteson* (1964) 61 Cal.2d 466, 469-470 [39 Cal.Rptr. 1, 393 P.2d 161]; accord: *People* v. *Brommel* (1961) 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Trout* (1960) 54 Cal.2d 576, 585 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97]; *Lynumn* v. *Illinois* (1963) 372 U.S. 528, 537 [83 S.Ct. 917, 9 L.Ed.2d 922]; *Rogers* v. *Richmond* (1961) 365 U.S. 534, 540-541 [81 S.Ct. 735, 5 L.Ed.2d 760]; *Payne* v. *Arkansas* (1958) 356 U.S. 560, 567-568 [78 S.Ct. 844, 2 L.Ed.2d 975].)

The improper introduction of the confession which has been obtained in violation of the constitutional right to counsel transgresses the protection of due process no less than the illegal introduction of a confession which has been coerced. In either case courts cannot inquire into the prejudicial nature of the introduction of an illegally obtained confession for the reasons stated in *People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]: "Almost invariably . . . a confession will constitute persuasive evidence of guilt, and it is therefore usually extremely difficult to determine what part it played in securing the conviction. [Citation omitted.] These considerations justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in evidence had no bearing on the results." Thus in the instant

case the improper introduction of the confession obtained in violation of a constitutional right compels reversal.

Summarizing the principal issue on the confession, we must decide this case in conformity with the decisions of the Supreme Court of the United States. That court having declared the content of a constitutional right, it is our function to enforce it in situations wherever it logically applies. To do otherwise would, in effect, be to distort the United States Constitution itself.

We cannot say here that because defendant did not speak the words of a request for counsel we need not apply the United States Supreme Court decisions; the constitutional right does not arise from the request for counsel but from the advent of the accusatory stage itself. We cannot compress a constitutional right, expressed by the United States Supreme Court, into the shape of a frozen formalism.

*The Alleged Incompetency and Insufficency of the Evidence to Establish a Valid Imprisonment Under a Life Sentence*

(a) *The alleged incompetency of the prosecution evidence to establish defendant's term.*

If defendant were validly incarcerated in San Quentin prison under an indeterminate life sentence, his guilt of malicious assault with a deadly weapon, which resulted in his fellow prisoner's death, would subject him to the death penalty automatically imposed by Penal Code section 4500. This court has consistently upheld the constitutionality of Penal Code section 4500 in its application to prisoners undergoing indeterminate life sentences. (See *People* v. *Jefferson* (1956) 47 Cal.2d 438, 442 [303 P.2d 1024]; *People* v. *Wells* (1949) 33 Cal.2d 330, 334-337 [202 P.2d 53]; *People* v. *Finley* (1908) 153 Cal. 59, 62 [94 P. 248]; affirmed in *Finley* v. *California* (1911) 222 U.S. 28, 31 [32 S.Ct. 13, 56 L.Ed. 75].)

Defendant urges that this court should change the above rule because of the adoption of the indeterminate sentencing procedure and because ''the Legislature in 1901 in enacting'' the automatic death penalty at no time contemplated the possible application of the statute to approximately one out of every three prisoners. Such a basic reconstruction of the statute must, however, lie with the Legislature. (See *People* v. *Wells, supra,* at p. 336.)

The homicide took place on December 12, 1961, at San Quentin prison; the prosecution adduced competent evi-

dence to establish that defendant was then imprisoned there under an indeterminate life sentence.

Robert Powers, the record clerk at San Quentin State Prison, testified that he served as official custodian of all inmate records and that he supervised entries upon each prisoner's warden's inmate record card concerning the fixing of terms and paroles based upon certifications of Adult Authority action. Clearly the custodian of records may competently testify concerning such entries and their sources. (See *People* v. *Jefferson* (1956) 47 Cal.2d 438, 443 [303 P.2d 1024]; *People* v. *Wells* (1949) 33 Cal.2d 330, 338 [202 P.2d 53].) Indeed, defense counsel stipulated that the inmate record card indicating that defendant was serving a life term could be admitted into evidence.

The prosecution also properly introduced the certifications of Adult Authority action, which constituted competent evidence to establish that defendant's term was unfixed on the date in question. (See *In re Smith* (1949) 33 Cal.2d 797, 800-801 [205 P.2d 662]; Code Civ. Proc., § 1918, subd. 6; Pen. Code, § 969b.) Finally, defendant's testimony tended to corroborate these records since he revealed an awareness that upon his return to prison following a parole violation, his sentence had been increased to maximum.

This evidence shows that defendant originally suffered imprisonment in 1957 for violation of Health and Safety Code section 11500 and that he received a sentence for the term then prescribed by law of five years to life. After the Adult Authority twice redetermined defendant's term following his imprisonment, it finally released him on parole in the spring of 1961. At the time defendant violated his parole, the relevant certification of Adult Authority action dated June 22, 1961, states: "Parole cancelled—return to prison ordered for the reasons set forth in the report of which this order is a part. (Term refixed at maximum in accordance with Resolution adopted 3-6-51.)"

Resolution No. 171 of the Adult Authority adopted March 6, 1951, provides that "effective April 1, 1951, when paroles are cancelled, suspended, and/or revoked, the previous action fixing term will be rescinded . . . and the prisoner shall be considered as serving the maximum term as prescribed in the Indeterminate Sentence Law, subject to further order of the Adult Authority. . . ." After its order of June 22, 1961, the Adult Authority did not redetermine or refix defendant's term. The effect of that order, by reference to resolution

No. 171, was to reset defendant's term at five years to life. Thus on the date of the crime, December 12, 1961, defendant was undergoing an indeterminate life sentence and was subject to Penal Code section 4500.

Defendant argues that in *Wells* and *Jefferson, supra,* defendant's term *had not been fixed,* and hence the evidence in those cases sufficiently proved that defendant "was a person undergoing a life sentence" under Penal Code section 4500, but that here the term had been originally fixed at five years and the certifications of the Adult Authority cannot suffice to prove anything more. To reach this strained result, however, defendant must completely ignore the order of June 22, 1961, and its reference to "Resolution Adopted 3-6-51."

(b) *The alleged invalidity of the order of the Adult Authority of June 22, 1961.*

We find no merit in defendant's contention that the June 22, 1961, order of the Adult Authority must fail for the following alleged three reasons: (1) It violated defendant's constitutional rights since the Adult Authority proceeded without affording to him notice or the opportunity for a hearing. (2) The prosecution failed to establish that the Adult Authority based its revocation of defendant's parole, and the increase in his term, upon good cause. (3) Defendant suffered double jeopardy in that, without according him a full hearing, the Adult Authority redetermined, and thereby increased, his term, which had theretofore been fixed.

No statute requires that the Adult Authority in exercising its jurisdiction to determine and redetermine sentences shall give the prisoner notice or a hearing. (*In re McLain* (1960) 55 Cal.2d 78, 84-85 [9 Cal.Rptr. 824, 357 P.2d 1080]; *In re Smith* (1949) 33 Cal.2d 797, 803, 805 [205 P.2d 662]; Pen. Code, § 3020.) The Penal Code specifically grants the Adult Authority power "to suspend, cancel or revoke any parole without notice." (Pen. Code, § 3060.) [17] "The provisions for determining or redetermining sentence and for granting, suspending or revoking parole do not violate due process because of the absence of a requirement for notice or hearing." (*In re McLain* (1960) 55 Cal.2d 78, 85 [9 Cal.Rptr. 824, 357 P.2d 1080].)

The evidence does establish the good cause which must be the predicate for the revocation of defendant's parole and the increase in his term. To redetermine a sentence or to suspend or revoke parole the cases clearly require a showing of good cause (*In re McLain* (1960) 55 Cal.2d 78, 87

[9 Cal.Rptr. 824, 357 P.2d 1080]) ; such "cause must be stated in the order suspending or revoking the parole." (Pen. Code, § 3063. ▆▆ A disputable presumption supports the conclusion that the minute entry on the certification of Adult Authority action correctly states the action taken by that body, including the fact that good cause existed for revocation of parole. (*In re Smith* (1949) 33 Cal.2d 797, 801 [205 P.2d 662] ; Code Civ. Proc., § 1963, subd. 15.) ▆▆ Defendant alleges no facts and submits no evidence to rebut such presumption ; on the contrary, defendant testified at the trial that his parole was revoked when he surrendered himself for violating its terms by the use of narcotics. He stated then that at the narcotic treatment unit at Chino he "got involved with somebody else and I stuck up for the guy and I got violated and sent to San Quentin." The record manifests good cause.

▆▆ Finally, the action of the Adult Authority in refixing sentences and perhaps increasing their length does not constitute double jeopardy. To support his contrary contention, defendant cites the cases of *United States* v. *Benz* (1931) 282 U.S. 304 [51 S.Ct. 113, 75 L.Ed. 354], and *Ex parte Lange* (1873) 85 U.S. (18 Wall.) 163 [21 L.Ed. 872], but these cases hold only that a *court of record* may not increase a penalty already imposed without unconstitutionally subjecting the defendant to double jeopardy.

▆▆ Defendant received notice of, and a hearing on, the charge for which he was originally convicted ; thereafter, he was subject to the executive orders of the Adult Authority. The original ". . . proceedings resulted in a conviction and the imposition of a sentence that was indeterminate, and until fixed, amounted to a maximum sentence provided for the crime in question. ▆▆ When the Authority reduces a maximum sentence, its action, in the very nature of things, is tentative and may be changed for cause. Such procedure presents no federal question." (*In re McLain, supra,* 55 Cal.2d 78, 85.)

### The Alleged Failure of the Court Properly to Instruct the Jury.

▆▆ Defendant contends that the court should have instructed the jury in the following manner : (1) That the jury determine the factual issue whether defendant was actually serving a life sentence at the time of the commission of the homicide. (2) That the jury consider the lesser included offenses of assault with a deadly weapon by a prisoner not undergoing a life sentence (Pen. Code, § 4501) and battery

by a prisoner not undergoing a life sentence (Pen. Code, § 4501.5.) (3) That the jury consider the possible alternative of finding defendant guilty of murder (Pen. Code, § 187), attempted murder (Pen. Code, § 217) or manslaughter (Pen. Code, § 192).

Defendant does not allege that the court rejected such instructions, nor does the clerk's transcript include any rejected instructions; we must, therefore, assume that defendant did not request them. The issue then becomes whether the court must render these instructions on its own motion. We cannot uphold such a requirement.

The court properly instructed the jury and twice repeated the elements of the charged offense; it emphasized that the plea of not guilty placed in issue ''every material allegation.'' Thus the court directly presented to the jury the question of whether defendant was undergoing a life sentence; we see no reason for holding that the court should have further underscored this issue. (*People* v. *Jefferson* (1956) 47 Cal.2d 438, 444 [303 P.2d 1024].)

Nor did the court err in failing to instruct the jury concerning the lesser included offenses specified by defendant. This court has repeatedly held that even those instructions requested concerning lesser included offenses need not be given in the face of a charge of violation of Penal Code section 4500. (See *People* v. *Jefferson, supra,* 47 Cal.2d 438, 444; *People* v. *Oppenheimer* (1909) 156 Cal. 733, 745 [106 P. 74]; *People* v. *Carson* (1909) 155 Cal. 164, 175-177 [99 P. 970].) Moreover, the trial court instructed the jury on the subject of malice as well as assault with a deadly weapon, so that defendant did not suffer a total deprivation of instructions on lesser offenses. ▮ In any event, no prejudice resulted from the presence or absence of such instructions because defendant was clearly a life-termer.

The judgment is reversed.

Traynor, C. J., Peters, J., and Peek, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment finding defendant guilty of violating section 4500 of the Penal Code,* for these reasons:

---

*Section 4500 of the Penal Code provides, in part: ''Every person undergoing a life sentence in a state prison of this State, who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death . . . .''

*First. Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], relied on by the majority opinion, is not applicable to the facts of the present case.

In that case, the court said: "We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." (P. 492.)

Referring to the "circumstances here" (that is, in *Escobedo* v. *Illinois, supra*), the court said: "We hold, therefore, that where, as here, (1) the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, (2) the suspect has been taken into police custody, (3) the police carry out a process of interrogations that lends itself to eliciting incriminating statements, (4) *the suspect has requested and been denied an opportunity to consult with his lawyer,* and (5) the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright,* 372 U.S., at 342, [83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (378 U.S. 490 et seq.) (Numbers and italics added.)

It is conceded in the instant case that element No. 4 was not present, that is, defendant did not request, and was not denied, an opportunity to consult with his lawyer.

Under the precise and limiting language used by the Supreme Court in the *Escobedo* case, it is clear that the facts in the instant case are different and that the *Escobedo* case is not applicable.

We should not extend the rule of the *Escobedo* case. This court should take a realistic view of the holding in *Escobedo* v. *Illinois, supra,* so as to support law enforcement officers when their activities are not clearly unlawful, and not to increase their difficulties in preventing future murders and other crimes.

We should support them in their lawful efforts, however zealous, to protect citizens and to eliminate crime and enforce the laws of this state. We should not take an unrealistic view of the rules of law and make it more difficult to apprehend

criminals and to prevent and reduce the increase of crime which has taken place at an alarming rate in the past year.

In *People* v. *Hartgraves*, 31 Ill.2d 375 [202 N.E.2d 33], the Supreme Court of Illinois, in discussing *Escobedo* v. *Illinois*, at page 36 [202 N.E.2d] said: "We do not, however, read the *Escobedo* case as requiring the rejection of a voluntary confession because the State did not affirmatively caution the accused of his right to have an attorney and his right to remain silent before his admissions of guilt."

*Second.* Article VI, section 4½, of the California Constitution, in my opinion, requires an affirmance of the judgment in this case. That section provides: "No judgment shall be set aside . . . in any case, on the ground of . . . the improper admission . . . of evidence . . . or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, *the court shall be of the opinion* that the error complained of has resulted in a miscarriage of justice." (Italics added.) (See *People* v. *Hines*, 61 Cal.2d 164, 175 et seq., 181-182 et seq. [37 Cal.Rptr. 622, 390 P.2d 398].)

An examination of the record in the present case leads me to the "opinion" that there is no doubt of the guilt of defendant and that he was not prejudiced by not being advised of his right to counsel. He had been convicted of previous criminal offenses, and there is a presumption that on such occasions he was informed of his right to counsel. (Code Civ. Proc., § 1963, subd. 15.) In addition, he had been in the state penitentiary, and it is a matter of common knowledge that the inmates discuss their rights and are informed, among other things, of their right to counsel.

I am thoroughly in accord with Mr. Justice Schauer's statement in his dissenting opinion in *People* v. *Hines, supra,* 61 Cal.2d 164, 181: "The mandate of section 4½, article VI, is clear and is unequivocally recognized by this court in *People* v. *Watson* (1956) *supra,* 46 Cal.2d 818, 836-837 [12] [299 P.2d 243]; likewise clear is the limitation of section 4 on our powers of review to 'questions of law alone, in all criminal cases where judgment of death has been rendered.' These are not just statutes; these are constitutional bulwarks. By these sections the People, properly concerned for their own (and loved ones') safety, have demonstrated that a judgment of death, once rendered, is not lightly to be set aside. Mere speculation that judicially declared procedural error *may*

have contributed to the verdict is not a basis upon which we can lawfully disturb a judgment of death. The verdict is not ours; it is that of the jury. And the judgment is that of the trial court duly rendered pursuant to the verdict. We have neither right nor power to reverse that judgment unless the evidence before us (the totality of the record) establishes not only error but the probability—i.e., preponderates in showing—that a result more favorable to defendant would have been reached in the absence of the error.

"It bears repeating that in *Watson* we said '[T]he test, as stated in any of the several ways, must necessarily be based upon reasonable probabilities rather than upon mere possibilities; otherwise the entire purpose of the constitutional provision would be defeated.' (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [12] [299 P.2d 243].) Today, in the case at bench, it appears to me that by the majority's ruling 'the entire purpose of the constitutional provision [is] defeated.' "

Again, it is my opinion that the judiciary should consider the protection of innocent people in this state and endeavor to support law enforcement officers in their efforts to prevent the increase of crimes now taking place at an alarming rate in this and other states of the United States.

We should recognize that the prevention of crime may be best enforced by the prompt conviction and punishment of criminals and should endeavor in every legitimate manner to protect our innocent citizens and to avoid unnecessary reversals of conviction of manifestly guilty criminals, thereby better protecting the law-abiding public.

BURKE, J., Dissenting.—In *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], the Supreme Court of the United States repeatedly limited the application of the rules it was establishing to circumstances such as were present in that case. Such expressions as "Under these circumstances," and "Where, as here," are utilized repeatedly, indicating that the court did not intend such rules to be applied universally regardless of the circumstances of the particular case.

This cautionary qualification is reiterated in the Supreme Court's reference to the holding in *Crooker* v. *California,* 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448], which the Supreme Court stated did not compel a result contrary to its ruling in *Escobedo.* The court stated: "In that case [*Crooker*] the Court merely rejected the absolute rule sought

by petitioner, that 'every state denial of a request to contact counsel [is] an infringement on the constitutional right *without regard* to the circumstances of the case,' *Id.*, at 440. (Emphasis in original.) . . . The Court, applying 'these principles' to 'the sum total of the circumstances [there] during the time petitioner was without counsel,' *id.*, at 440, concluded that he had not been fundamentally prejudiced by the denial of his request for counsel. Among the critical circumstances which distinguish that case [*Crooker*] from this one [*Escobedo*] are that the petitioner there, but not here, was explicitly advised by the police of his constitutional right to remain silent and not to 'say anything' in response to the questions, *id.*, at 437, and that petitioner there, but not here, was a well-educated man who had studied criminal law while attending law school for a year.'' In this reference to *Crooker* the Supreme Court again stresses that each case must be weighed in relation to the totality of its own circumstances. *Crooker* was distinguished from *Escobedo,* in part, because Danny Escobedo was ''a 22-year old of Mexican extraction with no record of previous experience with the police,'' Escobedo, at page 482, whereas Crooker, as noted, was a well-educated man who had knowledge of criminal law.

Similarly, here, Dorado was a 26-year-old convict serving a life term in prison for sale of narcotics at the time the malicious assaults with a deadly weapon, resulting in a fellow prisoner's death, were charged against him.

Justice McComb notes in his dissent that Dorado had been convicted of previous criminal offenses, and there is a presumption that on such occasions he was informed of his right to counsel upon arraignment and during trial. (Code Civ. Proc., § 1963, subd. 15.) In addition, he had been in the state penitentiary and it is a matter of common knowledge that the inmates discuss and are well aware of their constitutional rights.

The degrees of sophistication in criminal matters of Danny Escobedo and Robert Dorado are poles apart, and the ''circumstances'' of this case differ so widely from those of *Escobedo* as to render the rules laid down in *Escobedo* inapplicable in this case.

Justice McComb alludes to the further distinguishing feature that one of the basic elements of the *Escobedo* rule is not present in this case, namely, that '' (4) *the suspect has requested and been denied an opportunity to consult with his lawyer.*'' The majority opinion recognizes this distinction

but holds that the failure of the accused to request counsel does not justify "the application of a rule of law different from that established in *Escobedo*. The basic reasoning of the court's opinion in *Escobedo* will not permit such a formalistic distinction" and, further, that "The right to counsel matures at this critical accusatory stage; the right does not originate in the accused's assertion of it. The accused's request for counsel indicates no more than that he, himself, at that point in the proceedings, perceived the need of legal assistance. The request merely constitutes evidence that the accused finds himself in an accusatory predicament."

I concur in the view of the majority that the right to be furnished counsel and to be advised of the right to counsel does not depend upon a request. If the contrary were the rule it would favor the prison-wise criminals and discriminate against the ignorant, the uneducated or the mentally retarded. I agree with the majority that "the constitutional right does not arise from the request for counsel but from the advent of the accusatory stage itself." I differ with the majority in its apparent assumption that in every case, regardless of distinguishing circumstances, if such accusatory stage has in fact been reached, no confessions elicited from the accused by interrogations of the police may be properly received in evidence unless it be shown that the accused was expressly advised by his interrogators of his right to remain silent and of his right to counsel or he has knowingly waived such right. I believe the crucial test at the accusatory stage is whether we may reasonably infer from the circumstances (and this, the United States Supreme Court makes clear, means *all* the circumstances) of the particular case that the accused was aware of his constitutional rights. This is the test that court applied in both *Crooker* and *Escobedo*.

Were the accused a law professor, a lawyer or a former policeman, under the holding of the majority, before the confession of such a person would be admissible, it would be necessary to show that during the process of interrogation and before the incriminating admissions were obtained, the accused had been informed of his constitutional rights or had waived them. Under *Escobedo* the test to be applied by the trial court or a reviewing court would be: Under the "sum total of the circumstances" of the particular case, was the law professor, lawyer or former policeman "fundamentally prejudiced" by the failure of the interrogators to inform

him at that time of his right to counsel and of his right to remain silent?

Forearmed with the rule of *Escobedo*, it would be better practice for police during such an interrogation to routinely advise the accused of his rights, thereby avoiding conjecture at the trial and appellate level of the effect of failure to so advise him. However, absent a showing that such advice was given, this court should not extend the rule of *Escobedo* so that as a matter of law, rigid and inflexible, and notwithstanding the degree of sophistication or the criminal record and experience of the accused, no confession thus obtained may be received in evidence.

As noted, the majority holds that the mere utterance of the words, ''I want a lawyer,'' do not create the right to counsel—it is the totality of the circumstances present which brings that right into maturity; similarly, it is not the mere utterance of the words, ''You are entitled to an attorney and to remain silent,'' which render admissible in evidence the subsequent utterances of the accused. It is the ''sum total of circumstances'' present which must be weighed to determine whether the accused was unaware of his rights and, therefore, was ''fundamentally prejudiced.'' There are many situations where the mere utterance of such words by an interrogator would not render a subsequent confession admissible. Thus, the accused's awareness of his constitutional rights is the crucial test and not whether someone informed him of such rights immediately before eliciting the incriminating statements.

The circumstances present in *Dorado*, established by the record, indicate that as a previously convicted felon he had been informed of his constitutional rights. His degree of criminal sophistication establishes this as fully as did the one year of legal education establish knowledge and waiver in *Crooker*. Such interpretation does not present any inconsistency between the rule in *Crooker* and that in *Escobedo*. ''Under the circumstances'' of this case, namely, the defendant's criminal sophistication, there is known, not presumed, waiver of any purported right to be unnecessarily advised of that which he already knows.

The mandate of section 4½ of article VI of the California Constitution requires this court to review the entire record to determine not only if there was error in the admission of evidence, as is asserted here with respect to Dorado's confession to the authorities, but the probability that a result more

favorable to the defendant would have been reached had the error not been committed. In applying this constitutional test I firmly believe that no reversal is justified, that the verdict of the jury should be upheld and the judgment of the trial court affirmed.

For these reasons I dissent.

Schauer, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.