[Crim. No. 179. Fifth Dist. Jan. 7, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT
OATS, Defendant and Appellant.

Jin Ishikawa, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Roger E. Venturi and Anthony S. Da Vigo, Deputy Attorneys General, for Plaintiff and Respondent.

STONE, J.—Defendant appeals from a judgment entered on a jury verdict finding him guilty of robbery, violation of Penal Code section 211. His attempted appeal from the sentence is dismissed.

About 2 a.m. January 23, 1965, Paul Putnam was on duty at a Shell service station at Olive and Highway 99 in Bakersfield. As he was hosing off a cement slab, he was approached by a male negro wearing a brown derby, whom he subsequently identified as James Seward. Seward asked for directions to Edwards Air Force Base, and for change for a 50-cent piece. As Putnam walked toward the cash box, Seward asked where the restrooms were. Putnam secured the change and resumed hosing the slab while waiting for Seward to return. Another negro, wearing a silk stocking over his face and carrying a hexagon-barrelled rifle, came around the corner of the building and said, "Hold it, drop the hose and go to the restrooms." As Putnam started toward the restrooms he was met by Seward, who held out his hand and Putnam gave him his change. The two men followed Putnam into the restroom, took his wallet and cashbox key, and warned him not to turn around. Seward left, but the man with the gun remained and took a silver dollar and a house key from Putnam. The cashbox lid slammed, and Seward returned, saying, "Let's go," and both men disappeared. Putnam left the restroom, saw nothing of the robbers, called the sheriff, and then saw a light-colored car turn south onto the highway.

Three nights later a Union service station in the area was robbed, the robbers again escaping in a light-colored car. About ten minutes later two officers were alerted by radio and given a description of a light-colored 1949-1950 De Soto or Dodge proceeding east on Panama Lane. The officers, westbound on Panama Lane, passed an east-bound vehicle which fitted the description given them, and thought they saw two persons in the car. They made a U-turn and pursued the vehicle, but as they neared it they could see only the driver,

who ignored their flashing red light. He ran a stop sign and struck a telephone pole before his car came to rest against a fence. Just before the car stopped, the officers noticed the driver's door was open and no occupant was visible. In searching the surrounding area they discovered defendant hiding behind a log. In defendant's automobile the officers found a brown derby, a 12-inch knotted silk stocking, and a hexagon-barrelled, lever-action Winchester rifle.

Defendant is a negro, 5 feet 9 inches tall, and weighs approximately 165 pounds. When apprehended he was wearing a dark three-quarter length coat and blue Levis.

Putnam, the victim of the Shell robbery, described the man with the gun as a negro, approximately 5 feet 8 inches tall, of medium build, from 135 to 140 pounds, and wearing a dark coat. He testified that the hexagon-barrelled rifle and stocking discovered in defendant's vehicle at the time of arrest, and the dark coat worn by defendant, were similar to those used by the man with the gun who robbed him. The hat found in defendant's car was the same type as that worn by Seward. Putnam testified that defendant's build and stature were similar to the man with the gun, but he could not say with certainty that defendant was the man who participated in the Shell robbery with Seward.

At the time he was apprehended and handcuffed, defendant was advised that he was under arrest for armed robbery, and further advised of his right to remain silent and of his right to counsel before making any statement, and that if he did make a statement it could be used against him. The arresting officer, in the presence of two other officers, asked defendant if he understood his rights and when he replied that he did not, the officer repeated each of defendant's rights to him. Defendant said he understood, and then told the officers that early in the evening he had met "James," whose last name he did not know. He said it was James' idea to rob the station and admitted that he, defendant, participated by driving the car but not in the actual robbery. He said he had gained possession of the gun and other articles when James handed them to him after the Union station robbery. At the request of officers, defendant walked a short distance down the highway and called "James" several times, without getting a response.

After defendant was booked, he was again advised of his rights; he waived his right to counsel, and related substantially the same story as he had told at the time of his arrest,

and added "Why the questions, we did it, you've got us." About 9:30 the next morning an officer advised defendant of his rights, including the right to remain silent and to have the services of an attorney before answering questions. Defendant voluntarily submitted to interrogation, during which he confessed that he took part in both the Shell and Union service station robberies.

At the trial, defendant not only denied committing both robberies but denied that he had ever been at the Shell station. He admitted he had known James Seward, the other defendant, for about a month and a half prior to his arrest. By way of alibi, defendant testified that just prior to his arrest he was driving his mother's gray 1950 Dodge on a Panama Lane overpass when he struck a negro pedestrian. He got out to see if the person was hurt, but the man ran away. Defendant said he then saw the gun with a hexagon barrel in "his bag that were busted," that he placed some of the contents of the bag in his car and some in his jacket pocket, and proceeded east on Panama Lane until the red light of the police car made him aware that he was being pursued. He said he attempted to evade the police because he was on parole, that there was no other person in the automobile with him, and that he gave the police the name "James" because it was the first name that came to his mind when he was asked about an accomplice.

Defendant admitted he was advised of his rights by the arresting officers before confessing, but said he confessed because he did not want to cause any trouble and he knew he was going back to prison for parole violation anyway as he had been caught driving without a license. He said he called for "James" at the scene of arrest because an officer holding a rifle on him was shaking as if defendant had "robbed a bank or something." However, defendant admitted the officer did not threaten him with the rifle.

Defendant was acquitted of the Union service station robbery but convicted of the Shell station robbery, and from that judgment of conviction he appeals, asserting three grounds: (1) The court made no order expressly finding the confessions voluntary and admissible in evidence. (2) The foundational evidence was not heard outside the presence of the jury. (3) The evidence does not support the judgment of conviction.

The first two grounds of appeal are predicated upon the opinion of the United States Supreme Court in *Jackson* v.

*Denno,* 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.2d 1205]. Taking up defendant's first assignment of error, we gather from *Jackson* v. *Denno* that absence of an express ruling by the trial judge that he has found a confession voluntary and admissible in evidence, does not require a reversal if the record reflects that he did, in fact, make such a determination. In discussing this point, the court said, at pages 378-379: ". . . the judge's conclusions are clearly evident from the record since he either admits the confession into evidence if it is voluntary or rejects it if involuntary. Moreover, his findings upon disputed issues of fact are expressly stated or may be ascertainable from the record."

The record before us reflects that foundational evidence was adduced establishing prima facie that all of defendant's constitutional rights were protected, including those enunciated in the recent cases of *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. It was only then that the trial judge permitted defendant's confessions to be introduced in evidence. Thus, as the court reasoned in *Jackson* v. *Denno,* the trial judge's "conclusions" are clearly reflected by the admission of defendant's confessions into evidence after a proper foundation was laid.

 A collateral question is raised by the admission of the confessions upon the foundational evidence of the prosecution alone. The confessions had been admitted and the People's case rested before defendant took the stand as his own defense witness and gave testimony bearing on the voluntariness of his confessions. But defendant is in no position to complain of the order of proof, first, because he did not challenge the reliability of the People's foundational evidence; second, he elected to present his evidence as to voluntariness as part of his defense rather than as part of the foundational *voir dire*; and, third, he made no objection to the introduction into evidence of his confessions. In short, that the jurors heard the confessions before they heard defendant's testimony was not the fault of the procedure, but was a circumstance of his own making.

We note, in passing, that by admitting the confessions into evidence the trial court did not deprive the jury of the right to make the ultimate determination of whether they were voluntary. He instructed the jury: "The fact that the court has admitted into evidence the alleged confession or admis-

sion of a defendant does not bind the jury to accept the court's conclusion, and the jury, before it may take a confession or admission into consideration, must for itself find whether or not it was a voluntary confession or admission. If the jury concludes that a confession or admission was not made voluntarily, it is the duty of the jury to entirely disregard the same and not consider it for any purpose.''

More profound questions are raised by defendant's second point, that he was entitled to have the question of voluntariness heard and determined outside the presence of the jury. *Jackson* v. *Denno* makes it clear that before a jury is permitted to hear a confession the trial judge must determine that it was given voluntarily, and that all constitutional safeguards have been met.* It does not tell us, however, whether the foundational evidence must be heard by the court outside the presence of the jury. Under the Massachusetts procedure, which California follows (*People* v. *Gonzales,* 24 Cal.2d 870, 876 [151 P.2d 251]; *People* v. *Schader,* 62 Cal.2d 716, 727 [44 Cal.Rptr. 193]), the jury hears the foundational evidence upon which the trial court makes the determination of voluntariness, but it does not hear the confession unless and until the trial judge has determined that the confession is admissible. In a footnote in *Jackson,* at page 378, the court said: ''We raise no question here concerning the Massachusetts procedure.'' Thus the court did not disapprove the Massachusetts and, a fortiori, the California procedure, but neither did it specifically or affirmatively approve it.

There is much to be said for defendant's contention that foundational evidence should be heard by the judge outside the presence of the jury. For one thing, as *Jackson* points out by a footnote, page 389: ''. . . an accused may well be deterred from testifying on the voluntariness issue when the jury is present because of his vulnerability to impeachment by proof of prior convictions and broad cross-examination, both of whose prejudicial effects are familiar. The fear of such impeachment and extensive cross-examination in the presence of the jury that is to pass on guilt or innocence as well as voluntariness may induce a defendant to remain silent, although he is perhaps the only source of testimony on

*The court in *Jackson* said, at page 395: ''It is both practical and desirable that in cases to be tried hereafter a proper determination of voluntariness be made prior to the admission of the confession to the jury which is adjudicating guilt or innocence.''

the facts underlying the claim of coercion. Where this occurs the determination of voluntariness is made upon less than all of the relevant evidence.''

Additionally, it is quite possible that inflexible adherence to the Massachusetts procedure might result in a jury hearing evidence pertinent to the question of voluntariness but prejudicial and inadmissible as to the question of guilt or innocence. For example, where a defendant is charged with the commission of crimes other than that for which he is being tried, evidence concerning such other crimes is ordinarily inadmissible. But if the defendant were promised leniency or immunity as to the other charges as an inducement to confess, or threatened with having the degree of the other crime increased, such evidence would be relevant to the issue of voluntariness but not to the question of guilt or innocence.

However, a defendant is not left without a means to protect himself when such a circumstance appears imminent; he can obviate prejudice to himself by requesting a hearing outside the presence of the jury. There is nothing unusual about this procedure: motions, offers of proof, and questions concerning the admissibility of evidence (*People* v. *Gorg,* 45 Cal.2d 776, 780 [291 P.2d 469]), are frequently heard outside the presence of the jury. As the defendant is usually the one who has reason to inject matters inadmissible as to the question of guilt, that bear on the voluntariness of his confession, he is in a position to protect himself by requesting a hearing before the judge outside the presence of the jury. Since evidence to be adduced to prove involuntariness is peculiarly within the knowledge of the defendant, it is not unreasonable that the burden rests on him to request that matters he regards as prejudicial on the question of guilt, first be heard outside the presence of the jury. If the trial judge holds the confession involuntary, the jury never hears such foundational evidence. On the other hand, if the confession is admitted, whether he will present prejudicial foundational evidence to the jury for their determination of voluntariness, rests with the defendant. To require evidence of voluntariness, regardless of its nature, to be first heard outside the presence of the jury in every instance, would seem unnecessary duplication under the Massachusetts procedure wherein the question of voluntariness ultimately rests with the jurors, a determination they cannot make without hearing the foundational evidence.

The upshot of our interpretation of *Jackson* v. *Denno* is that the trial judge is required to determine that constitutional requirements surrounding the making of a confession are proved before he admits the confession, and that the record must reflect this determination; but it does not require that the court hear the foundational evidence out of the presence of the jury unless the defendant so requests and accompanies his request with a showing that evidence proffered or to be adduced is inadmissible as to the question of guilt.

■ Defendant's final point need not detain us long, since it is predicated upon a misconception of the function of an appellate court. He first reminds us, "In criminal cases guilt must be established beyond a reasonable doubt." He then quotes the following from *People* v. *Borchers,* 50 Cal.2d 321, at page 328 [325 P. 97]: "In a criminal trial the burden is upon the prosecution to prove beyond any reasonable doubt every essential element of the crime of which defendant is to be convicted."

However, in *Borchers* the Supreme Court was speaking of the function of a trial judge reviewing evidence on a motion for new trial. Justice Schauer, who authored the *Borchers* opinion, expressed the governing rule on appeal in a later criminal case, *People* v. *Redrick,* 55 Cal.2d 282, at page 289 [10 Cal.Rptr. 823, 359 P.2d 255]: "The credence and ultimate weight to be given the evidence of the various particular circumstances are of course for the trier of fact, and 'It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' [Citation.]"

Defendant directs his assertion that the evidence is insufficient to support the judgment primarily to the circumstantial evidence. The rule stated in *Redrick,* quoted above, is applicable to circumstantial evidence.

Defendant's exculpatory testimony about striking a negro pedestrian on an overpass at 1 a.m., the pedestrian's flight, defendant's finding the gun and other incriminating evidence in a bag the pedestrian dropped, was so obviously a concoction that the jury was justified in disbelieving it.

Defendant's argument that the evidence is not sufficient to support the judgment perforce rests upon the mistaken assumption that his confessions were improperly admitted in evidence. A review of the entire record, including the confessions, points unerringly to defendant's guilt.

The judgment is affirmed.

Conley, P. J., and Brown (R.M.), J., concurred.