181 So.2d 763 (1965)
248 La. 730
STATE of Louisiana
v.
Joshua CARTER and Lawrence Baptiste.
No. 47514.
Supreme Court of Louisiana.
June 7, 1965.
Dissenting Opinion June 21, 1965.
On Rehearing January 17, 1966.
John P. Dowling, Edward M. Baldwin, New Orleans, for appellants.
Jack P. F. Gremillion, Atty. Gen., William P. Schuler, Asst. Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Jim Garrison, *764 Dist. Atty., Louise Korns, Asst. Dist. Atty., George Piazza II, Asst. Dist. Atty., for appellee.
FOURNET, Chief Justice.
Joshua Carter and Lawrence Baptiste prosecute this appeal from their conviction of a charge by indictment returned by the Orleans Parish grand jury on December 12, 1961, of the aggravated rape[1] of Mrs. Myrtle Sandifur, as well as from their death sentences thereunder, relying for the reversal thereof on numerous errors allegedly committed during the course of their trial, to which objections were timely made and perfected in Bills of Exceptions.
The record reveals Mrs. Sandifur, a married woman of the Caucasian race about 43 years of age, left her home on Soniat Street on the night of November 18, 1961, accompanied by her husband, Napoleon Sandifur, to walk their small dog, stopping to visit friends who operated a bar in the 1300 block of Lyons Street. While walking back on Upperline Street about midnight, near its dimly-lighted intersection with Coliseum Street, she and her husband were suddenly and viciously attacked.
Mr. Sandifur testified he was "grabbed from behind," knocked to the ground, and savagely beaten into unconsciousness, he was unable to "recognize anything" because the area was so dark except that his assailants were four Negroes, two of them being taller than the other two. Before he was knocked to the ground and before losing consciousness, money amounting to less than $5.00 was taken from his wallet.
Mrs. Sandifur stated that prior to the time she and her husband were "jumped" she saw no one, her first knowledge of the attack coming when she was hit in the face, told to "shut up" when she screamed, and was struck again. From that time until she was taken home by the police a few hours later, she knew nothing. However, the record shows she was knocked to the ground at the point of attack, robbed of the $19.00 in her purse, ravished there by one of the assailants, dragged by him with the assistance of another through an alleyway, where both ravished her. She was discovered under bushes on Lyons Street shortly thereafter by police officers in an undressed condition from the waist, her girdle, underpants, false teeth (broken during the attack), and several other articles of clothing being found on the ground at this spot. Her condition was so serious Patrolman Arthur Trahan, who was at the scene, stated she was not only unconscious but so white and her breath so negligible he thought she was dead.
There were no other eye witnesses testifying at the trial, although an unidentified person notified the police about 12:25 a. m. the crime was in progress, and, as a result, several units of the police department were dispatched to the scene. Sergeant Felix Palmisano and Patrolman William Buckel, first to arrive, found Mr. Sandifur in a dazed condition, bleeding profusely from multiple cuts and bruises about the face. There was much blood on the sidewalk and ground in the immediate vicinity. On the sidewalk they found a man's wallet, a lady's shoes, purse, and the contents thereof. Mr. Sandifur, in an apparent moment of consciousness, seemed to remember seeing *765 his wife being dragged away and asked of her whereabouts.
Detectives Edward O'Donnell and John J. Perrot, arriving at the scene after the victims had been taken to Charity Hospital, observed the blood on the sidewalk and were told by other officers they had managed to piece together from Mr. Sandifur's incoherent statements that four Negroes had attacked him and his wife. Perrot, recalling having seen a Negro male wearing white tennis shoes running across Upperline Street and entering the Colonial Bar as he and O'Donnell were approaching the scene, at once backed the car to this place and, with O'Donnell, entered. There they found Lawrence Baptiste, age 20, Henry Baptiste, age 19, and Richard Ruth, age 15, sitting at the bar, each with a bottle of beer. The officers, upon directing the beams of their flashlights and noticing Lawrence was wearing white shoes, took the three out of the bar and, after placing them under arrest for the crime of armed robbery, took them back to the scene of the crime, where they were questioned for a few minutes. At this time Lawrence explained the blood found on his shoes resulted from a fight in which he had engaged in the bar earlier, while Henry denied the substance discovered on his shoes was blood. The three were then taken to the Second District Precinct Station, where they arrived about 1:30 a. m. Henry and Lawrence were booked with vagrancy under investigation for armed robbery; Ruth was not, as he was a juvenile.
When told the blood on his shoes would be compared with that of the victims and his alibi thoroughly checked, Lawrence purportedly made several inculpatory remarks. This prompted Ruth, who was nearby, to also make incriminating statements. The police, learning from these statements that Joshua Carter, age 17, was also implicated, arrested him at his home about 2:00 a. m., and, shortly thereafter, he was booked at the Second District Precinct Station with armed robbery and aggravated rape. Ruth was then booked with aggravated rape. Some time thereafter, as the result of a telephone call from the Detective Bureau, Lawrence and Henry were rebooked with armed robbery and aggravated rape.
About 3:15 a. m. these four defendants were transferred to the Detective Bureau at Police Headquarters, where they were fingerprinted and "mugged," each making oral statements, including Carter and Henry, who, until then, had been adamant in protesting their innocence. These statements were later reduced to writing by Desk Sergeant Dyer, Carter signing his at 5:25 a. m., Henry at 6:55 a. m., Lawrence at 7:25 a. m., and Ruth at 7:45 a. m.
A little after 8:00 a. m. the accused were taken to the scene of the crime, where additional oral statements were purportedly made, and where they performed certain acts demonstrating the manner in which they had committed the crime, photographs being taken of them as they went through their gestures. At 8:00 o'clock the following morning (November 20, 1961), these men were taken to the "show-up room", and it was while there that Carter indicated he and Lawrence had criminally assaulted Mrs. Sandifur. All were then taken back to the Precinct Station, where they remained until taken to Parish Prison on November 27, 1961.
On December 12, 1961, the grand jury for Orleans Parish, in a Bill of Indictment prepared by the District Attorney and charging all four with aggravated rape, returned a true bill only as to Joshua Carter and Lawrence Baptiste, pretermitting the charges against Henry Baptiste and Richard Ruth. However, on February 23, 1962, they were also charged by indictment with the aggravated rape of Mrs. Sandifur. On November 26, 1962, all four were brought to trial, and, after a hearing lasting 15 days, Joshua Carter and Lawrence Baptiste were convicted and sentenced to death. Richard Ruth and Henry Baptiste, who received a qualified verdict of guilty without capital punishment, did not appeal, *766 and are presently serving their sentences under these convictions.
The transcript recording this lengthy trial is voluminous, consisting, in addition to exhibits, of 12 volumes totalling 2,737 pages that are devoted to the inscription of the minutes of the court, the indictments, the opening statement of the District Attorney, various documents and evidence heard on the voir dire examination of the jurors and during the trial on the merits, as well as the trial judge's charge to the jury, the Bills of Exceptions and appended Per Curiams. However, of the innumerable Bills reserved during the trial, only 40 have been perfected, and of these, 16[2] were apparently abandoned by defense counsel, who briefed and argued only 24.
The first two Bills now relied on for the reversal of the conviction and sentence of Lawrence and Carter were reserved when the trial judge refused to order the District Attorney to furnish defense counsel with copies of all oral confessions, admissions, and inculpatory statements the accused may have made to the police, the police reports themselves, and the Coroner's proces verbal in the case. Each defendant was, however, given a copy of his written confession, as well as the one made by each of his co-defendants.
Bills of Exceptions Nos. 4, 5, 8 and 23 were reserved when the trial judge refused to quash the indictments, defendants urging as grounds therefor the violation of their rights of due process and equal protection caused by the manner in which R.S. 14:42, under which they were charged, is administered and enforced since its history eloquently reflects this has resulted in a "plethora of capital punishments directed to and intended almost exclusively for Negroes," and the denial of counsel's right to establish this allegation by producing statistical data they endeavored to secure under writs of subpoena duces tecum directed to the Governor, the Secretary of State, and the Attorney General, as well as his refusal to permit defense counsel to introduce in evidence three exhibits that would purportedly further strengthen this contention, and testimony relative thereto.
Bill of Exception No. 6 was reserved when the trial judge refused to declare R.S. 14:42 unconstitutional on the ground that it had been enacted by an invalidly constituted Legislature since that body had failed to reapportion itself since 1930 despite the constitutional mandate that it must do so every ten years in the light of population growth as reflected by official federal census compilations.
Bills Nos. 9, 10, 12, 13, 14, 15, and 16 were reserved to the rulings of the trial judge refusing to excuse for cause several prospective jurors, with the result that defense counsel were compelled to exhaust their peremptory challenges and accept an obnoxious juror.
Bill of Exceptions No. 11 presents a contention somewhat similar to that raised in the grouping of the Bills mentioned immediately above, having been reserved when the trial judge maintained the State's objection to defense efforts to elicit from prospective jurors on voir dire examination what effect on their verdict the factif provedthe statute denouncing aggravated rape in Louisiana under which the accused were being tried (R.S. 14:42) was being prejudicially administered and enforced against Negroes might have.
Bill of Exceptions No. 19 was reserved when the trial judge refused to permit defense counsel, over State objection, to ask a defense witness then incarcerated if he "could lose that time," after the witness had denied anyone had told him how to testify and stated he had only five months left to serve on his sentence as he was getting "2 for 1."
The twentieth Bill was reserved when the judge refused to permit Mrs. Elizabeth *767 Fowler to testify with respect to advice she had given Carter's mother, whom she employed as a domestic, the day following the commission of the offense.
Bill of Exceptions No. 25 is levelled at the instruction given by the judge at the request of one of the jurors who sought enlightenment as to the meaning of a sentence of life imprisonment, and whether one so sentenced could be paroled.
Bill of Exceptions No. 28 was reserved when the trial judge qualified the State's witness Milton Cox as an expert "to test for the presence of blood and blood typing."
Bills Nos. 29 and 37 were reserved to the trial judge's refusal to permit defense counsel to put two of the defendants on the stand, in the presence of the jury, for the limited purpose of rebuttal on the predicate for the introduction of their confessions.
When the judge ruled the oral and written confessions of the defendants, as well as their re-enactment of the crime, had been freely and voluntarily made, defense counsel reserved Bill of Exceptions No. 31.
Bills of Exceptions No. 39 was reserved when the trial judge denied the motion for a new trial, and No. 40 when he denied the motion in arrest of judgment, both of which contain almost identical allegations. In the motion for a new trial there is contained the usual allegation that the verdict is contrary to the law and the evidence and a reiteration of all of the Bills just mentioned. However, in this motion defense counsel asserted for the first time (1) that R.S. 14:42 is unconstitutional in that the penalty of death or aggravated rape constitutes the cruel and unjust punishment denounced by the Eighth and Fourteenth Amendments to the Constitution of the United States, and (2) the method employed in selecting grand and petit juries in Orleans Parish is discriminatory inasmuch as the grand jurors are chosen by the judge, whereas in the other parishes they are selected by lot or chance, and that the members of both panels have never been impartially selected with the result that Negroes, in Orleans Parish, are either systematically excluded or a token number systematically included, thus reducing the participation of qualified Negroes in these panels to a minimum; consequently, as in the instant case, the State was able to prevent all prospective Negro jurors from serving through the exercise of its peremptory challenges.
We find that a careful study and analysis of the foregoing Bills, the alleged errors forming the basis thereof, and the Per Curiams of the trial judge appended thereto will readily disclose all of them, with the exception of Nos. 20, 31 and 39, are without merit, either because they are not supported by the law and the jurisprudence, or by the evidence. In fact, counsel concede that in briefing Bills Nos. 4, 5, 6, 8, and 28 they were unable to "find sufficient merit in them to brief them in detail;" and were constrained to admit in brief that the first two Bills were not supported by the law and jurisprudence of this State, but suggest we overrule this prior jurisprudence. No useful purpose can be served by treating each of the remaining Bills, for they are of similar import and totally lacking in merit.
As pointed out above, Bill of Exceptions No. 20 was reserved when Mrs. Fowler was denied the right to relate to the jury the advise she had given the mother of Carter when she arrived for work on the morning after the crime was committed. The note of evidence taken in connection with this Bill shows Mrs. Fowler had read about Carters' arrest in the paper and was, therefore, cognizant of the reason why Mrs. Carter was so upset; consequently, when she learned from her employee that she had been denied permission to see her son despite the fact she, her husband, and her minister had all gone to the jail for this purpose several times, Mrs. Fowler advised: "It is your right to see your son; go down to the Legal Aid Bureau and they will make arrangements for you to see your son, which she did on the following day." The trial judge, in his Per Curiam to this Bill, states this testimony of Mrs. Fowler was *768 obviously hearsay and irrelevant, having nothing to do with the case.
We are in full accord with the principle of law enunciated in State v. Murphy, 234 La. 909, 102 So.2d 61, relied upon by the trial judge in making his ruling, and which is to the effect that a trial judge must be accorded wide discretion to determine whether particular evidence sought to be introduced in a criminal prosecution is relevant to the case. However, we do not agree with his conclusion that this testimony falls into the category of hearsay evidence. The testimony sought to be elicited from Mrs. Fowler was, in our opinion, of the same tenor as that given by Judge Blair Lancaster and Attorney Joseph Hurndon. Judge Lancaster was permitted to testify that he had received a call from Reverend Singleton, the Carter family minister, and as a result, called the Second District Precinct Station and "told them I would like them to find out whether Joshua Carter needed any medical attention." Hurndon, testifying as a witness, stated that on Wednesday, November 22, 1961, he had several telephone calls from members of the Ruth family and, about 5:30 p. m., spoke to Ruth's mother, and although he advised her he handled civil cases primarily, he did, at her insistence, "go to see the boy to try to determine the basis of the facts surrounding his arrest." He further testified that when he was permitted to see the boy, after identifying himself as an attorney, he was conscious of a police officer standing nearby. Such evidence as this given by these two men, as well as that given by Mrs. Fowler, is not, in our opinion, hearsay, but instead, very material in explaining certain events, as well as for purposes of corroborating the testimony of other witnesses touching on the contention of the defendants that they were denied visits by their families and a minister.
While this error, in itself, may not be considered sufficiently prejudicial to warrant a reversal, we pass to the more serious Bills, and, more particularly, the one that has given us much concern, i. e., the Bill reserved when the trial judge permitted to be introduced in evidence the oral and written confessions of the defendants, as well as their re-enactments at the scene of the crime.
Counsel for the defendants contend, first, that all statements made by them, as well as their acts at the scene of the crime, were obtained while they were being illegally detained by the police, who did not advise them of their right to counsel, their right to remain silent, and of the fact that whatever they might say could be used against them; second, that the written statements were not dictated by them, and that none of the oral statements or written confessions attributed to them, or the re-enactments at the scene, were freely and voluntarily given; and, finally, that for several days they were not permitted to use the telephone to talk to members of their families, and that these families, as well as a church leader, had been denied the right to see or assist them in any way.
In argument, defense counsel readily conceded that the jurisprudence of this State does not support their contention that the police are under obligation to advise an accused after arrest against self-incrimination, his right to assistance of counsel, to remain silent, and the possible use of any incriminating statements before receiving his confession.
Counsel submit, however, that this jurisprudence has been completely overruled by the decisions of the United States Supreme Court, particularly in Escobedo v. State of Illinois,[3] 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, holding "that when the process shifts from investigatory to accusatory when its focus is on the accused and its purpose is to elicit a confessionour adversary system begins to operate, and, under the circumstances here, the accused *769 must be permitted to consult with his lawyer." (Emphasis ours.)
While we consider this statement of our land's highest courtbinding on usa rather strong pronouncement, and one that might well be stretched eventually to destroy the very rights sought to be protected, as was pointed out in one of the dissenting opinions in this case that was later followed by the Supreme Court of California in People v. Dorado, 42 Cal.Rptr. 169, 398 P. 2d 361, and more recently by the United States Court of Appeal for the Third Circuit in Russo v. New Jersey and Bisignano v. New Jersey, 351 F.2d 429, handed down May 20, 1965, we are constrained to view the Escobedo decision as applicable only to the very unusual facts of that case, as we think is clearly indicated by the above italicized portion, until this matter has been more definitely clarified and resolved by our highest court.[4]
There can be no question but that criminal law enforcement in the several states of the Union has been seriously handicapped by the recent decisions of the United States Supreme Court, rendered apparently under a zealous compulsion to give the highest and broadest possible construction to the rights guaranteed by the United States Constitution in order to protect individuals called to the bar of justice, and if this trend is further extended, as is being suggested by defense counsel in the instant case, this might well result in the complete destruction of the very rights sought to be protected, and more particularly, the rights of the vast majority of our people to be secure in their person and property from acts of violence by others, as is also guaranteed by the Constitution. However, in disposing of the case at bar, we prefer to rest our decision on the merits of the contention that the confessions and actions of the defendants at the scene of the crime were not free and voluntary.
As pointed out by the author of the instant opinion in State v. Robinson, 215 La. 974, 41 So.2d 848, on rehearing, "The rule now universally obtaining in all countries where the common law prevails, that a confession of a person accused of a crime is admissible in evidence only if freely and voluntarily made, is the result of the humanitarian principles evolved by courts during civilization's progress from the ancient harsh and continental practice of putting a person charged with a crime to the torture and breaking him piece by piece until the confession was obtained, regardless whether a crime had, in fact, been committed, or, if committed, had been committed by the person being tortured.
"It was only natural, therefore, that this humane principle found its way into our system of law when our forefathers came to this country in their quest for full liberty and that there was included in the Bill of Rights to the Constitution of the United States the provision that no one could be compelled in a criminal case to be a witness against himself.
"The delegates representing the people of this state at the Constitutional Convention of 1921 included in the Bill of Rights to this Constitution a similar provision, and, in order to insure it would be beyond the power of the legislature or the judiciary to depart from what was the then accepted jurisprudence of this court, they added as a part of this same section, Section 11 of Article I, the provision that `No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel confession of crime; nor shall any confession be used against any person accused of crime unless freely and voluntarily made.'
"In conformity therewith, the legislature of 1928, in adopting a Code of Criminal Procedure, incorporated in its Articles 452 *770 and 451 (now R.S. 15:452 and 15:451) respectively, the following provisions: `No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime,' and `Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.' (Brackets ours.)"
The jurisprudence of this court will clearly show strict compliance with this legislative mandate has been universally adhered to. See, for example, State v. Honeycutt, 216 La. 610, 44 So.2d 313; and State v. Ferguson, 240 La. 593, 124 So.2d 558. Furthermore, as pointed out in the Honeycutt case, "* * * for a confession to be admissible in evidence against an accused in any criminal case, the burden of proof is on the State to show that such confession was freely and voluntarily given and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. In numerous cases this court has gone so far as to hold that, before what purports to be a confession can be introduced in evidence, it must be shown, not only affirmatively but by proof beyond a reasonable doubt, that it was free and voluntary. * * *" (Emphasis ours.)
It is the contention of the State that the trial judge's rulings with respect to the confessions of the defendants in the instant case were proper. In his Per Curiams the judge states he found the confessions, whether oral or in writing, had been freely and voluntarily given, there being no evidence of any kind to establish resort to duress had been made to secure them. He pointed out that 16 police officers were called in rebuttal and each testified no brutality, threats, promises, or any form of coercion was made by them or in their presence to extort the confessions and produce the actions of the defendants. He further states that had there been brutality, "it would have shown on the photographs" introduced in evidence. He gave no credence to the testimony of the defendants, considered totally discredited the testimony of their witnesses Albert Nora and Frank Maples because they were "fellow prisoners," and concluded all of the defense evidence and testimony on this point was fully and completely rebutted by the testimony of the 16 officers above referred to. He also found as a fact the defendants had not been held incommunicado; that no law required police officers to advise them of their rights before taking their confessions; and further, that the defendants were not denied the use of the telephone.
The record reveals that all four defendants denied they had dictated the written confessions as claimed by the policemen, each testifying he signed the statement prepared by an officer only because of threats and the fear of being subjected to further brutality. In fact, Carter and Henry, as mentioned above, up until the time they were taken to the Detective Bureau had not admitted participating in the crime; it was only after being confronted repeatedly with the statements of co-defendants and being beaten that they signed their confessions. Carter related he was hit on the forehead and in the stomach with fists, and on the head with both the booking-book and a lug wrench; Henry stated he was also beat on the head with the book, and hit in the back with the wrench.
It is true, as stated by the trial judge, that each of the 16 officers connected with some phase of this case testified in rebuttal none of the defendants were struck or abused by them, that they made no promises of immunity or adjurations to tell the truth or used any form of coercion upon them to secure the confessions, and that no other person had done so in the particular officer's presence. Certainly if this comprised all the evidence in the record on the subject we would unquestionably have no alternative but to uphold the ruling of the trial judge with respect to the admission of the *771 confessions. However, after giving careful consideration to the evidence and photographs of the accused introduced at the trial, we entertain serious doubt that the confessions secured from the defendants and their re-enactment of the crime at the scene were freely and voluntarily made.
In the first place, we do not find the testimony of the various police officers to the effect that no visitation rights were denied the defendants for several days after their arrest is as reliable and convincing as found by the trial judge as the evidence to the contrary is overwhelming, nor do we think the trial judge was justified in failing to give any credence to the testimony of Albert Nora and Frank Maples simply because they were "fellow prisoners." The record fails to disclose anything upon which the trial judge could rest his conclusion in this respect. On the contrary, by appearing as witnesses, these men took the chance of losing the privileges of the prison, such as time earned because of good conduct.
Maples, who was confined at the time the crime was committed in the Second District Precinct Station, corroborated the testimony of Henry that he had been beaten with the result that he was cut above the right eye, which was swollen and bleeding. Maples testified that when Henry was thrown into the same cell with him, he was in such a dazed condition Maples first thought he was drunk. When Henry apparently began to recover, Maples noticed the cut over his right eye and helped him wash it. His testimony also corroborates in a measure Carter's testimony with respect to the bruises he had received, for Maples stated he noticed when all four were placed in the cell with him after they were returned to the Precinct Station following their reenactments at the scene, Carter had knots on his head. The latter is further corroborated by Nora's testimony that he was serving a sentence in Parish Prison when all of the defendants were brought there on November 27, 1961, and he noticed a "large bump" on Carter's head. The testimony of this witness also corroborates that of Lawrence, as he stated he saw bruises on Lawrence's chest.
Each of the defendants corroborates the testimony of the others in some respects. As an example, with reference to Carter's condition, Lawrence testified his "head looked strange * * * had a bump on it * * * and was out of shape." Henry related that Carter's "cheekbone was all swole up * * * his face was knotted up, across his forehead," while Ruth noted that Carter's "haid was one-sided. One side of his haid was high, and the other side of his haid was low." This testimony is further supported by that of Carter's mother who stated she observed signs of injury on the head, forehead, and cheek of her son when she was finally permitted to see him on November 21, 1961.
As to Henry's condition, in addition to the corroboration given by Maples at the time Henry was placed in the cell at the Precinct Station, Lawrence testified he noted Henry was cut above his eye and that it was swollen. Lawrence further corroborated Henry's testimony in that he stated while they were in the Detective Bureau, he saw Perrot strike Henry with a lug wrench. Ruth testified he saw Henry get hit in the stomach while in the Bureau of Identification and his testimony further corroborates that of Henry as to his treatment at the Second District Precinct Station, for although Henry was confined in a back room, Ruth could hear the thump sound of the fist blows being administered to Henry and could hear him groaning, moaning and hollering; while at the Detective Bureau he was sitting next to Henry and saw the condition of his eye. His testimony that he was positive Henry had no such injury when they were earlier in the Colonial Bar is fully corroborated by that of Officer William Conlin who related that when Henry, Lawrence, and Ruth were returned to the scene immediately after their arrest, he spoke to Henry because he knew him, and observed no cuts on his face.
*772 Lawrence's testimony that he was subjected to a severe beating in the booking area of the Second District Precinct Station is fully supported by that of Ruth, who, apparently prompted by the fear of being given the same, made his alleged statement to the police. Lawrence's testimony that during the time he was handcuffed and at the scene of the crime immediately after his arrest, he was repeatedly struck by officers with their fists in the stomach, kicked, and hit on the head with a flashlight, as well as being thrown up against a police car, was fully corroborated by that of Henry.
Unlike the trial judge, from our observation of the photographs of the defendants introduced during the trial of the case, we think they irrefutably corroborate their position on this subject. It is easy to detect bumps on the right cheek and forehead on the "mug shot" of Carter. These are even more apparent in the photographs taken at the re-enactment of the crime at the scene. In still another photograph of Carter taken from the left side, a large bump in the region of his lower left jaw is clearly discernible.
While the photographs taken of Henry do not clearly show the cuts and bruises he claims he received, and which Maples testified existed when Henry was thrown into the cell with him at the Second District Precinct Station early in the morning on November 19, 1961, these photographs were not taken until three days later, and the swelling had had sufficient time to subside and the cut over the eye to heal to some extent. In explaining why Henry's picture was not taken at the time the other three were "mugged," which was November 19, 1961, the photographer stated that Henry's picture had been taken on that day, but that the pictures did not come out and they did not keep defective negatives. Nevertheless, when Henry's full-face photograph and the one of the right side of his head are carefully examined, there appears to be some swelling around his right eye, and an indication of a scar along its upper eyebrow line. Further, the picture of Henry taken with Ruth at the scene at the time of the re-enactment, only a few hours later, clearly shows the swollen condition of the right eye.
As above pointed out, while each of the 16 officers denied he had personally struck any of the defendants, and stated he had not seen any other officer do so, they weakened their own testimony by not remembering receiving a call from Judge Blair Lancaster, which he stated he made, and by denying having received any demand or request to see the defendants during the first two days of their confinement.
We think the testimony of Officer Francis Burgess, the desk sergeant at the Second District Precinct Station where Lawrence, Henry, and Ruth were first taken, and at which time Lawrence is said to have voluntarily confessed to O'Donnell in the presence of several officers, is most illuminating. Although Burgess admitted having a typewriter in his office and had at other times taken statements from arrested persons that were considered confessions, he did not take down the statement attributed to Lawrence at this time or hear any questions, answers, threats, or other form of maltreatment, stating: "I didn't pay any attention to what was going on" and "All I knew was that the officers brought them in there to book them. I did my job, I booked them, I made the mugging slips, and that was the end of my job." He did not seem to remember anything that occurred on this occasion in his small office, although it was established by the records and also the testimony of Officer Thomas Daley that little was going on other than the booking of these defendants as it was a quiet night. He did not remember whether the three were brought in together; he did not remember what happened to Henry and Ruth after they were booked; he did not remember how long Lawrence stayed in the booking area. He did not remember telling Ruth he could not use the telephone; nor could he remember if anyone called to see Ruth while he was on duty. He did not remember who relieved him at 7:00 a. m. on *773 Sunday, November 19, 1961, or even whether he had worked the 11:00 p.m. to 7:00 a.m. shift, although he admitted the handwriting in the arrest book showed he had made the entries therein. He did not recall seeing any members of Carter's family or Reverend Singleton at the Precinct Station.
We find, further, that the testimony of the officers touching on the matter of the purported written confessions actually supports the contention of the defendants that they did not, in fact, dictate them. The statements themselves as typewritten reflect a strong similarity. Detective O'Donnell, the only officer who testified as to the manner in which the confessions were given when reduced to writing, stated Officer Dyer took down "substantially" what the defendants had dictated. However, when studied and analyzed, we feel this testimony strongly corroborates the fact that Dyer simply wrote out a summation of the answers given by each defendant to the questions put to him. Such procedure is certainly open to challenge, the facts of this case furnishing an excellent example of why this is true. We think the better practice is to include the questions of the officers and the answers thereto as given by the defendants, verbatim.
We think the time element involved in reducing each of the four short confessions to writing speaks eloquently in support of our conclusion. The defendants were taken to the Detective Bureau where questioning began about 3:45 a.m. and continued until about 4:45 a.m., when Carter purportedly began dictating his confession, this lasting until 5:25 a.m., a period of 40 minutes, at which time he signed the document. Henry, who, up to this time had been most adamant in his denial of any participation in the crime, is said to have followed, and it took 1 hour and 30 minutes before he signed at 6:55 a.m. Next was the purported dictation by Lawrence which lasted until 7:25 a.m., when he signed; Ruth was last, signing at 7:45 a.m.
While this is a most revolting and heinous crime, in the light of the above, we are impelled to conclude the confessions and the re-enactment of the crime were not free and voluntary.
For the reasons assigned, the convictions and sentences of Lawrence Baptiste and Joshua Carter are annulled and set aside and the case is remanded to Section "H" of the Criminal District Court for the Parish of Orleans for a new trial.
SANDERS, J., dissents, being of the opinion that the confessions were properly admitted in evidence for the reasons assigned by the trial judge.
SUMMERS, Justice (dissenting).
These defendants confessed, not once, but at least three times
I cannot understand the majority accepting the testimony of these accused persons that their confessions were compelled by force. The only evidence to corroborate their testimony that they were beaten to force the confessions is the testimony of Frank Maples and Albert Nora (these two were fellow prisoners, convicted felons with long criminal records which included aggravated rape), and Joseph Herndon, an experienced attorney, who did nothing to preserve the evidence of bruises he said he saw on the persons of the accused. This is a man with at least ten years experience as an assistant city attorney, who would have called a doctor or a photographer, but he knew this would be of no avail as all four defendants were already photographed. I have seen these photographs and I see no evidence of brutality and the trial court judge saw none.
Moreover, a total of fifteen police officers who had contact with the defendants at one time or another during the night of their arrest testified to the absence of threats, coercion, or inducements while the defendants were in their presence.
*774 The trial judge and jury heard these witnesses and they did not believe that the confessions were induced by force. And yet, the majority, by reference to the printed record, repudiates that finding.
The question of the admissibility in evidence of a confession is for the trial judge, its effect for the jury; and whether a sufficient basis was laid for the admission of a confession is an issue of fact upon which the ruling of the trial judge will not be disturbed on appeal unless that ruling is clearly against the preponderance of the evidence on that issue. State v. Bueche, 243 La. 160, 142 So.2d 381 (1962); State v. Steward, 238 La. 1036, 117 So.2d 583 (1960); State v. Weston, 232 La. 766, 95 So.2d 305 (1957).
I dissent.

ON REHEARING
McCALEB, Justice.
We granted a rehearing in this case to permit the State to demonstrate, if it could, its claim that we erred on first hearing in holding the confessions of the four participants in the heinous crime for which they have been convicted were secured in some degree by police brutality and, therefore, were admitted in evidence against them contrary to the mandate of Section 11 of Article 1 of our Constitution that "* * * No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel confession of crime; nor shall any confession be used against any person accused of crime unless freely and voluntarily made".
On rehearing, counsel for the State specify:
(1) That we should not have set aside the finding of the trial judge on the issue of police brutality in obtaining the confessions inasmuch as that finding is supported by the evidence and the photographs of the accused;
(2) That it was legally incorrect to reject the confessions because they were not in the form of verbatim questions and answers and thus, in effect, deny to investigating and enforcement officers the right of securing statements dictated by accused persons to police officers who take down in writing the substance of such statements, which are subsequently signed by the accused, and
(3) In holding that the time involved in obtaining the written confessions supports the conclusion that the defendants were beaten by the police.
Considering, first, the second complaint of the State, we note from a re-examination of the record that there is a conflict between defendants' testimony and the statements of the police officers as to whether the confessions, which were placed in narrative form, were actually given in question and answer form. We find it unnecessary to resolve this conflict for, since the substance of the confessions was recorded by Officer Dyer in narrative form and the defendants signed and made them their written act, it is immaterial whether they were dictated to the officer or given by answers to questions propounded by the police. It is true that the typewritten statements reflect, as stated in the original opinion, a strong similarity. But this is a factor of no importance for, when it is considered that the defendants were jointly engaged in perpetrating the crimes for which they were charged, the various accounts of their activities (which we think they have given, whether by duress or voluntarily) must be intrinsically the same. Hence, we are now of the opinion that the circumstance of similarity does not warrant the implication that the defendants did not dictate the substance of the statements recorded by the officer.
Nor, on reflection, do we believe it is necessarily the better practice for officers, in taking down confessions of crime wherein the accused gives his answers to questions propounded by the investigator, to *775 inscribe verbatim the questions asked and answers given thereto as the confession of the accused. While this form is permitted by Article 453 of the Code of Criminal Procedure (R.S. 15:453), it is not obligatory. The jurisprudence of this Court is that written confessions need not be in the exact language of the accused; they are sufficient if the substance of the oral statement is recorded. State v. Brasseaux, 163 La. 686, 112 So. 650; State v. Kennedy, 232 La. 755, 95 So.2d 301 and State v. Domino, 234 La. 950, 102 So.2d 227.
Albeit we have no doubt that the defendants gave the confessions recorded by Officer Dyer, this finding furnishes no answer to the serious question presented in the case, i. e., whether these confessions and other oral inculpatory statements, or any one or more of them, were induced in some measure through cruel treatment administered by the police on the persons of the defendants.
Pretermitting, for the moment, discussion of the State's contention of error in our prior holding as to admissibility vel non of the confessions, we address our attention to the third complaint of the State that we erred in holding that the time element involved in reducing each of the four short confessions to writing supports our conclusion that the defendants were beaten by the police.
We find little substance in the contention. Two of the defendants, Carter and Henry Baptiste, are shown by the evidence to have been steadfastly adamant to police questioning when they were first arrested and did not admit participation in the crime until they were taken at 4:20 a. m. on the morning of November 19, 1961, to the Detective Bureau where, according to their testimony, after being confronted repeatedly with the statements of their codefendants and being beaten, they gave their confessions. The fact then that it took 40 minutes from the time Carter began dictating his confession to the time he signed it, and an hour and thirty minutes in the case of Henry Baptiste, are circumstances (when considered in connection with the fact that Ruth's confession was completed in only 20 minutes) which tend to support the conclusion on first hearing that the confessions were not entirely free and voluntary. In any event, the time element involved in the completion of these confessions was but a minor factor in the result heretofore reached. Our decision was primarily based on the defense testimony of brutal treatment which we found believable because it was corroborated by physical and other credible evidence.
On the main question in this case, i. e., whether the confessions and oral statements of the defendants emanated in any degree from corporal punishment administered by the police, we have re-examined the voluminous testimony and exhibits submitted by the State and the defendants with care. The result of our reconsideration has served only to strengthen our conviction that the State has not only failed to show by evidence which convinces us beyond a reasonable doubt that the confessions were free and voluntary but that, on the contrary, the statements of the defendants and their witnesses that they were beaten clearly preponderates over the categorical denials of the 16 officers testifying for the State. We reluctantly come to this conclusion, as stated in our original opinion, in view of the direct and circumstantial evidence which clearly establishes the guilt of all the defendants of barbarous and fiendish criminal acts upon two defenseless people. But the law respecting the use of confessions protects the guilty as well as the innocent and we are still persuaded that, in the light of the physical and other overwhelming evidence which supports the testimony of these defendants, the confessions have not been shown by the believable evidence to have been made free from influence, fear, duress, intimidation, menaces and threats. The reasons stated in our original opinion are so clearly and cogently expressed that further comment at this time would be superfluous. It suffices, we *776 think, that we dispose briefly of the argument of counsel for the State that our holding on first hearing is erroneous.
In assailing our opinion, counsel contend in essence that we have not accorded sufficient weight to the findings of the trial judge and that, since the judge saw and heard all the witnesses and was in a better position than we are to determine the credibility of their statements, we should not disturb his ruling that the State has shown beyond a reasonable doubt that the defendants were not beaten or intimidated in any degree.
The argument is not well founded. On first hearing, we did accord to the per curiams of the trial judge as much weight as was possible under the facts, but we found that the reasons given for the judge's rulings were not sustained by the preponderating believable evidence. Initially it was our viewand a re-examination of all photographs offered in evidence confirm that viewthat the Bureau of Identification pictures taken of the defendants a few hours after the crimes were committed and those taken of them during their re-enactment of the crimes at 8:00 o'clock on the same morning (including those of Henry Baptiste which were taken on November 22, 1961) clearly exhibit that Carter and Henry Baptiste had swollen lumps on their heads and faces. This in itself, in our opinion, weakens the credibility of the officers' testimony. In these circumstances, we cannot follow the argument of counsel for the State when they say that, because the judge was able to compare the pictures of the defendants with the living specimens who sat in front of him during the trial, his conclusion that the photographs showed no evidence of beating or ill treatment must be accepted.
Nor do we find substance in counsel's contention that the defense attorneys should have had the defendants photographed at or during the trial, so that the later pictures could be compared with the earlier photographs of the Bureau of Identification in support of the defendants' testimony that they were beaten. In making this argument, counsel overlook the provisions of the law that the burden is always on the State to show that a confession is free and voluntary. Hence, the shoe was on the other footthe State should have produced pictures of the defendants as of the date of trial. Moreover, it is of some significance that the judge does not state in his per curiam that the physical condition of the defendants' heads and faces at the time of trial, with relation to the bumps and swelling clearly visible in the photographs, was substantially the same and that the facial disfigurement was due to protuberance of some sort disconnected with trauma.[1]
In addition, as pointed out on first hearing, the credibility of the evidence of the police officers[2] is adversely affected by their weak and unsatisfactory denials that visitation rights were not accorded to the families and advisors of the defendants, despite the overwhelming evidence to the contrary. Indeed, we find it strange that counsel for the State have chosen on this rehearing to ignore discussion of this phase *777 of the case particularly since our holding was based in part on this circumstance.
Finally, it appears to be the main theme of counsel for the State that, since the defendants were apprehended within less than an hour after they committed their violent crimes "* * * while they still had fresh blood and/or seminal fluid on their shoes and clothing; before they had had time to think objectively about what they had done to the Sandifurs that night, get rid of the incriminating stains on their clothes, and establish credible alibis; * * *", they were not in any position to successfully maintain their innocence and, therefore, readily confessed to the police officers voluntarily. From this premise, counsel ask the question "What reason or motive, then, would the police officers have had for beating confessions of guilt out of the four arrested youths in the instant case?" and they answer the question "Absolutely none". It is then submitted that this is the logical reason for this Court to hold that defendants were not beaten.
We cannot sustain this argument. In the first place, it is founded more on speculation than fact. Furthermore, we find its logic faulty. For, while we agree with counsel that the police may have obtained voluntary confessions at some time during the investigation if restraint had been exercised, we are not so sure that the officers, after viewing the battered faces and unsightly bodies of the victims of these crimes, and having apprehended within less than an hour the culprits who had committed such inhuman acts of mayhem and rape, were not in such a mental state of revulsion and resentment that they were able to resist the administration of corporal punishment upon the guilty parties, especially so, when those accused when at first apprehended denied connection with the affair in spite of the clear physical evidence of guilt as shown by the blood stains on their persons. Under such circumstances, these officers, being normal human beings, might have done exactly what the defendants say they did. At any rate, we think the evidence suggests that the defendants were "roughed up" to some extent; it is certain and proper that they were not accorded "kid glove" treatment. Yet, because of this, as we have stated above, the confessions cannot stand the test of admissibility prescribed by law. Accordingly, the guilt of these defendants must be established by other evidence and not out of their own mouths.
For the reasons assigned, our original opinion, as herein modified, and decreed is reinstated as the final judgment on this appeal.
SANDERS, J., dissents.

ON REHEARING
FOURNET, Chief Justice (concurring).
I am in full accord with the conclusion in the majority opinion on rehearing that the state "has not only failed to show by evidence which convinces us beyond a reasonable doubt that the confessions were free and voluntary but that, on the contrary, the statements of the defendants and their witnesses that they were beaten clearly preponderates over the categorical denials of the 16 officers testifying for the State," and consequently, that the admission of these confessions in evidence constitutes reversible error.
However, I cannot understand how anyone reading the prevailing opinion on original hearing in this case could possibly eke out from any language used therein, as contended by the state, and on which the majority here apparently places reliance, that (1) it is authority for the proposition the confessions of the several defendants were rejected because "they were not in the form of verbatim questions and answers," or (2) that the length of time involved in preparing these so-called confessions for signature "supports the conclusion that the defendants were beaten by the police."
The confessions were rejected and declared inadmissible in evidence in this case *778 on original hearing for the reason stated in the majority on rehearing, as hereinabove set out, and not because the police officer failed to report the questions and answers verbatim. The original opinion merely pointed out that the testimony of Detective O'Donnell, the only officer testifying as to the manner in which the confessions were reduced to writing "when studied and analyzed, * * * strongly corroborates the fact that Dyer [the officer typing the confessions] simply wrote out a summation of the answers given by each defendant to the questions put to him," thus supporting the contention made by each defendant that he had not dictated the confessions as written, and it was with reference to this that the very next paragraph declares: "We think the time element involved in reducing each of the four short confessions to writing speaks eloquently in support of our conclusion." (The brackets have been supplied.)
I am also in full accord with the majority view here that the method of securing confessions through questions and answers is permitted by Article 453 of the Code of Criminal Procedure (R.S. 15:453),[1] but I feel it most unfortunate the author of this opinion saw fit to state it is not "necessarily the better practice" to report a confession verbatim when the accused answers questions propounded to him.
Certainly if there were a conflict as to the meaning of expressions contained in the confession, or with respect to the inclusion or exclusion of some material statement of fact, we, as a reviewing tribunal, would be in a better position to resolve such conflict if the confession is reported verbatim in case the question and answer method is used, "so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford." R.S. 15:450.
It is the well settled jurisprudence of this state that a confession of an accused cannot be divided for or against him, hence the requirement that "Every confession, admission or declaration sought to be used against any one must be used in its entirety." R.S. 15:450. Sound reason and logic therefore dictate that whenever a confession is reduced to writing, convenience permitting, it should be reported as taken, whether dictated or in question and answer form.

ON REHEARING
HAMITER, Justice (dissenting).
Originally, I subscribed to this court's conclusion that the confessions and oral statements of the defendants were inadmissible because they were given as a result of force and coercion practiced by the police officers on duty at the time.
However, after my having reconsidered the voluminous record containing the irreconcilably conflicting testimony and the exhibits (particularly the numerous photographs on which the holdings of the majority opinions herein are largely based), and after my having given due weight to the findings of fact of the trial judge supporting his rulings which must be done, I am now convinced beyond a reasonable doubt that such confessions and oral statements were freely and voluntarily given by the defendants and were therefore properly admitted in evidence.
Accordingly, I respectfully dissent.

ON REHEARING
SUMMERS, Justice (dissenting).
Setting aside these convictions by this court is based primarily upon a finding that *779 the confessions of the accused were not free and voluntary because they were induced by cruel treatment. The evidence of cruel treatment relied upon is mainly the testimony of the accused, which this court finds to be credible in spite of the testimony of the police officers to the contrary.
The opinion on rehearing says nothing which strengthens the original opinion on this vital issue. It relies upon generalizations and broad conclusions to reach its result. It points out no evidence which would warrant upsetting the finding of fact by the trial judge.
And no reason is given for accepting the testimony of these accused as credible; whereas every compelling reason exists in the very nature of things to reject their credibility: Their interest in the outcome of the prosecutiontheir lives being at stake; the evidence of blood and semen found on their clothes considered in connection with the atrocious crime which had without doubt been committed; their presence near the scene of the crime; the testimony of the victim's husband that there were four Negro men (two tall and two short) involved, which fits the descriptions of the accused, and the numerous other circumstances pointing to them as the perpetrators of the crimes charged beyond any reasonable doubt.
Weighed against their testimony that they were compelled to confess by force is the testimony of 16 law officers to the contrary, which this court rejects. There is no reason, other than unfounded suspicion, to conclude that these law officers had any interest in the outcome of the prosecution which would affect their credibility.
It is my opinion that a great injustice has been done to the great body of law abiding citizens of this state in setting aside the convictions of these accused.
I adhere to my original dissent.
NOTES
[1] This crime is denounced by R.S. 14:42, which provides:

"Aggravated rape is a rape committed where the sexual intercourse is deemed to be without the lawful consent of the female because it is committed under any one or more of the following circumstances:
"(1) Where the female resists the act to the utmost, but her resistance is overcome by force.
"(2) Where she is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
"(3) Where she is under the age of twelve years. Lack of knowledge of the female's age shall not be a defense.
"Whoever commits the crime of aggravated rape shall be punished by death."
[2] The abandoned Bills are Nos. 3, 7, 17, 18, 21, 22, 24, 26, 27, 30, 32, 33, 34, 35, 36, 38.
[3] Four of the nine members of the court dissented in this decision.
[4] Writs have been applied for in the Dorado case in order that the United States Supreme Court may review it, and a recent news release indicates a similar procedure will be followed in the Russo and Bisignano cases from the United States Third Circuit Court of Appeal.
[1] With respect to the photographs, we note that, in a picture taken of Henry Baptiste and Ruth at 8:00 a. m. on the date of the crime, Henry's right hand is visibly swollen. This physical evidence coincides with Henry's testimony that one of the officers attempted to kick him in his "privates" and, in shielding himself, he was kicked in the hands.
[2] In connection with the testimony of the police officers, we think it apt to observe that, whereas they are consistent in their denials that any of the defendants were beaten while they were present, in some instances the officers state under cross-examination, when asked specific questions about corporal punishment, that they do not remember or recall that any threats were made or physical force used. For example, Detective O'Donnell, the main witness for the State in laying the foundation for the admission of the confessions, when asked on cross-examination if he had hit Henry Baptiste on the head with a flashlight at the scene when he was examining Henry's shoes in the police car, answered: "I don't remember hitting him, no sir."
[1] This article provides: "A confession need not be the spontaneous act of the accused and may be obtained by means of questions and answers."