[Crim. No. 13029. Second Dist., Div. Two. Mar. 28, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. GEORGE EUGENE OSTER, Defendant and Appellant.

John W. Loucks, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Robert R. Granucci, Michael J. Kelly and Thomas Kerrigan, Deputy Attorneys General, for Plaintiff and Respondent.

HERNDON, J.—Defendant appeals from the judgment of conviction entered following a nonjury trial that resulted in his conviction of the crime of assault with intent to commit rape. (Pen. Code, § 220.) Prior convictions for assault with intent to commit rape and violation of Vehicle Code, section 503, were alleged and found to be true. Relying on *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], appellant contends that reversible error was committed when the trial court permitted the arresting officer to testify to a brief conversation had with appellant at his home prior to his arrest. We do not agree.

The evidence of appellant's guilt is overwhelming. It is unquestioned that an assault upon the complaining witness with intent to commit rape was committed, but appellant testified that although he had been with her very shortly before the occurrence, he was not the perpetrator of the criminal attack. Both the victim and appellant testified that they had met in a bar at Long Beach; that after a telephone call to her mother the victim had stated that she had to go to Maywood, a difficult trip by bus; and that the victim and appellant thereupon left the bar in appellant's car.

The victim testified that she soon became aware that appellant was not travelling toward Maywood. Instead, he stopped on a secluded street and made advances toward her. When she resisted he began hitting her and tearing her clothing. He exposed himself and tried to get on top of her. Each time she screamed appellant hit her, causing multiple contusions on her face, chest and arms. She ultimately managed to open the door on the passenger side of the car and made her escape. She proceeded to a nearby service station to call the police but they arrived on the scene before she had done so in response to a report by a resident who had observed the struggle within the vehicle.

Mr. Harding, a witness for the prosecution who lived near the scene of the crime, testified that after he had heard a woman screaming and crying for help for several minutes, he left his house and went to the scene to investigate. He found that the cries were coming from a vehicle in which a man and a woman were struggling. The car was a 1955 turquoise green Mercury two-door. He believed the license number was RPU 197.

Officer Skaggs of the Long Beach Police Department testified that as he responded to a radio call regarding a possible rape, he was flagged down by the victim at approximately

5:55 p.m. near the place of the attack. She was wearing a jumpsuit which had been torn open and she was attempting to conceal her otherwise nude body. He also observed that she had a dark red welt over her right eye, that her left eye was puffed and red, and that she had blood around her mouth.

After caring for the victim the officers ran a check on the license number given them by Mr. Harding. When it was ascertained that the vehicle bearing this license number could not have been involved, the officers had a check made for PRU 197 apparently because the letters "P" and "R" are so similar and subject to inadvertent transposition. It was found that the vehicle bearing this number was registered to appellant. When they arrived at his residence in Long Beach at approximately 9:15 p.m., they observed a vehicle closely matching that described by Mr. Harding and the victim.

The officer knocked on the door of the residence and spoke with appellant's father. When asked whether he had a son who fit the description given them by the victim, the father replied in the affirmative and stated that he was at home lying on the couch. At the father's invitation the officers entered the house and upon approaching appellant one of them advised him of his rights in accordance with the then applicable rulings in *Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. He asked appellant if he knew why the officers were there. He replied that he did not. The officer then informed appellant that a woman had contacted the police complaining of an assault and asked him whether or not he knew anything about it. Appellant stated that he did not. Appellant was then asked whether he could account for his activities during the day. He first stated that he had been at a Squirrel Lodge which was not located in Long Beach but later stated that he also had been in a bar in Long Beach.

Appellant was then arrested and a search of his person disclosed a coin holder which the victim identified as her own. Two paperback books belonging to the victim were found in the appellant's automobile.

Appellant testified that he had met the victim in a bar in Long Beach and had agreed to drive her to Maywood. However, he said that she had agreed to pay him $2 for gasoline and when he discovered that she did not have any money, he had put her out of his car and given her 50 cents for bus fare. He also claimed that she had offered herself to him for $5 but that he had refused. He denied striking her or attempting to

rape her. He testified that after putting her out of his car he returned home, arriving at exactly 4 :40 p.m.

Appellant testified that he had been placed under arrest prior to the time of his initial conversation with the officers. However, his version of this conversation was essentially identical with that reported by Officer Skaggs as shown by the following excerpt from his direct examination:

"Q. All right. Did you tell Officer Skaggs or Officer Patchin or both of them that you had been at a place called the Blue Squirrel earlier that afternoon? A. Yes. [Appellant had testified earlier that he had been to this bar and that it is located in the town of Bellflower rather than Long Beach although it is only a few miles from his residence.] Q. Did you say anything about the Squirrel Lodge? A. No, no. Q. Have you ever heard of such a place as the Squirrel Lodge? A. No. They misunderstood what I said. Q. Did you tell Officer Skaggs where you went from the Blue Squirrel? A. The only place I said was downtown Long Beach. Q. Did you tell him that you had been in a bar at Fourth Street or you went in the vicinity of Fourth Street? A. I believe I did because I was in a bar on Fourth Street."

As the trial court aptly noted in its comments preceding its decision, this is not a case in which it is possible that the testimony of the principals could be mistaken. Either appellant or the victim was deliberately committing perjury. In order to accept the appellant's story, it would have been necessary for the court to believe that within an hour after the victim had left appellant's car, another person in a vehicle of identical make, model and year, with an almost identical license plate, had picked her up and attempted to rape her and that rather than complain of the perpetrator of this vicious assault she had maliciously determined to "frame" appellant. The court observed quite correctly that it "is just such a fantastic coincidence as to be beyond belief."

From the foregoing summary of the evidence it is apparent that even if we were to accept the questionable contention that appellant's comments at the time of his arrest should not have been received in evidence under the holding in *Miranda* v. *Arizona, supra,* 384 U.S. 436, no possible prejudice resulted therefrom. In fact, at appellant's insistence his formal statement taken by the police after he had been in custody overnight was introduced into evidence, although it, too, had been obtained without the giving of the additional advice concerning his constitutional rights required by the subsequent deci-

sion in *Miranda*. Since the trial of the instant action commenced after the *Miranda* decision, the prosecution had not sought to introduce this statement but it was received at appellant's request because its contents were essentially consistent with his testimony given at the trial.

 The *Miranda* decision is primarily directed against "incommunicado interrogation of individuals in a police-dominated atmosphere." (384 U.S. at p. 445 [16 L.Ed.2d at p. 707].) In each of the four cases considered therein, "the defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures." (384 U.S. at p. 457 [16 L.Ed.2d at p. 713].) The court discussed at great length the psychological tactics suggested for interrogators by various police manuals (384 U.S. at pp. 448-455 [16 L.Ed.2d at pp. 708-712]), and stated that in deciding the four cases there under review, the court was concerned "primarily with this interrogation atmosphere and the evils it can bring." (384 U.S. at p. 456 [16 L.Ed.2d at p. 713].) The court further stated: "We are satisfied that all the principles embodied in the privilege [against involuntary self-incrimination] apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual *swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above* cannot be otherwise than under compulsion to speak." (Italics added.) (384 U.S. at p. 461 [16 L.Ed.2d at p. 716].)

Footnote 46 on page 478 [16 L.Ed.2d p. 726] of *Miranda* offers an indication of the type of questioning that is not necessarily proscribed by the holding therein and is explanatory of the trial court's statement that its "decision is not intended to hamper the traditional function of police officers in investigating crime. See *Escobedo* v. *Illinois*, 378 U.S. 478, 492 [12 L.Ed.2d 977, 986, 84 S.Ct. 1758]." Footnote 46 reads:

"The distinction [between proper investigative inquiries and in-custody interrogation] and its significance has been aptly described in the opinion of a Scottish court:

" 'In former times such questioning, if undertaken, would be conducted by police officers visiting the house or place of business of the suspect and there questioning him, probably in the presence of a relation or friend. However convenient the modern practice may be, it must normally create a situation very unfavourable to the suspect.' [Citation.] "

There were no accusatory questions propounded to appellant designed to elicit a confession, when he was simply given the opportunity in his own home and in the presence of his parents to clear himself of the suspicion that pointed in his direction by reason of the fact that his car apparently had been used in the commission of a crime. For example, if he had been able to state truthfully that his car had been used by another person that day, the police could have confirmed his statement, apprehended the guilty party and spared appellant the needless inconvenience and embarrassment of arrest. In addition, although the *Escobedo-Dorado* warnings do not meet the complete requirements of *Miranda,* nevertheless they were given to appellant herein and doubtless he understood that he was under no compulsion to accept the opportunity afforded him.

However, even if his initial statement should not have been received, it added nothing of substance to the prosecution's case. Since the victim's coin purse was found on his person and her books were located within his car, his meeting with her was established so conclusively that his admission that he had been in a bar in Long Beach that day added nothing thereto. We, therefore, declare our belief that if any error occurred herein, it was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied April 15, 1968, and appellant's petition for a hearing by the Supreme Court was denied May 22, 1968.